# IN THE SUPREME COURT OF IOWA

No. 17–1715

Filed April 24, 2020

**STATE OF IOWA,**

Appellee,

vs.

**TONY EUGENE DOOLIN,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Black Hawk County, Joel A. Dalrymple, Judge.

Defendant seeks further review of court of appeals decision declining relief on claims his trial counsel was ineffective for failing to object to the victim's first-time, in-court identification. **DECISION OF COURT OF APPEALS VACATED IN PART AND AFFIRMED IN PART; DISTRICT COURT JUDGMENT AFFIRMED.**

Mark C. Smith, State Appellate Defender (until withdrawal), and Maria Ruhtenberg, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Darrel Mullins, Assistant Attorney General, Brian Williams, County Attorney, and Brad Walz, Assistant County Attorney, for appellee.

**WATERMAN, Justice.**

In this appeal, we must decide whether the defendant's trial counsel provided ineffective representation by failing to object to the crime victim's first-time, in-court identification of the defendant. Responding to a report of a fight involving an armed man, police arrested the defendant at the scene minutes later with his handgun. The victim gave a statement hours later that a man jumped in his car and threatened him at gunpoint before fleeing when officers arrived. The victim gave no detailed description and was never asked to identify his assailant that night, or through a photo array or lineup any time before trial. Two years later, the victim at trial identified the defendant seated at counsel table. Defense counsel vigorously cross-examined the victim regarding his first-time, in-court identification and during closing urged the jury to disregard his testimony as unreliable. The jury returned a guilty verdict on charges of felony assault, intimidation, and possession of a firearm.

The defendant appealed, challenging the sufficiency of the evidence and arguing his trial counsel was ineffective for failing to object to his first-time, in-court identification and also for failing to request the Iowa State Bar Association Instruction No. 200.45 on eyewitness identification. We transferred the case to the court of appeals, which affirmed the convictions but preserved his ineffective-assistance claims for postconviction proceedings, concluding the record is inadequate to decide those claims on direct appeal. We granted the defendant's application for further review.

We find the record is adequate to decide Doolin's claim that his trial counsel was ineffective for failing to object to his first-time, in-court identification, and we reject that claim on the merits. Our precedent permits first-time, in-court identifications, and most other courts have

rejected due process challenges to first-time, in-court identifications. We elect to let the court of appeals decision stand on the remaining issues, and we affirm the district court judgment and sentence.

## I. Background Facts and Proceedings.

At 1:17 a.m. on August 15, 2015, Waterloo police officers responded to a report of a disturbance involving a man with a handgun at Flirts Gentlemen's Club. The caller described the offender as an African-American male wearing a black hat and black bandana. Officer Ryan Muhlenbruch arrived first at the scene and observed a man matching that description heading from Flirts to the adjacent parking lot. The suspect ducked behind a GMC Yukon, and Officer Muhlenbruch heard the sound of a heavy metallic object hitting the ground. The suspect was detained and identified as Tony Doolin. Police found a loaded Glock .40 caliber handgun underneath the Yukon and a black hat and bandana nearby.

Doolin admitted he owned the handgun and showed the officers his permit to carry it. Doolin claimed that a male in a white hooded sweatshirt had pulled a gun on him so he pulled his in self-defense. Officer Muhlenbruch observed that Doolin smelled like alcohol, slurred his speech, and had watery bloodshot eyes. Based on his nightly experience with intoxicated people, Officer Muhlenbruch determined Doolin was under the influence of alcohol. Doolin refused to perform any field sobriety test or submit to a preliminary breath test. Doolin was arrested and taken to the Black Hawk County jail.

At 2:30 a.m., Officer Ryan Jacobson arrived at Flirts to obtain security camera video. Dalibor Brkovic approached him to report that a man had pointed a gun at him in his vehicle earlier that morning. Brkovic said he drove to Flirts in a BMW x5 with two friends. The group planned to meet other friends at Flirts, including Zuhdija Menkovic and a part

owner in Flirts. Brkovic was on the phone with Menkovic as he approached Flirts, and Brkovic asked him to come outside to meet him. As Menkovic walked outside, he noticed a crowd of people, including a man with a handgun. Brkovic parked, and his friends exited the vehicle. Menkovic watched the man holding the handgun run by him and get into the BMW's open passenger seat. This man offered Brkovic $100 for a getaway ride. Brkovic refused. The man pulled a gun, chambered a round, and stuck the end of the barrel into Brkovic's chest, telling the driver he did not have a choice.

Menkovic stood by the driver's door and saw his friend held at gunpoint. Several people gathered near the passenger door and talked to the assailant, presumably trying to dissuade him from shooting Brkovic, who had shut off the engine and pretended that he had thrown his keys to Menkovic. The man turned to Brkovic and said, "Drive." When told that Brkovic could not start the BMW without the key, the man called him a profane name, exited, and started running as police cars reached the parking lot. Brkovic estimated that the man held the gun to his chest for about twenty seconds.

After the man ran off, Brkovic went inside of Flirts for about an hour before he approached Officer Jacobson to report what happened. The police told him that they had arrested an individual in the west parking lot. Brkovic then went back into Flirts with his friends. The police contacted Brkovic around a half hour later asking him to go to the Waterloo Police Department to give a statement. Brkovic had gone to Perkins for breakfast, ordered, and refused to go to the station to give a statement until he finished his meal. Brkovic ultimately gave a statement at the station at around 4:30 a.m., just over three hours after he was held at gunpoint.

During that interview, Brkovic told the officer that he did not remember what the man was wearing because he was more focused on the pistol. Although officers had Doolin in custody at that time, they never arranged a line up or photo array to see if Brkovic could identify Doolin as his assailant. Brkovic left the station without providing much of a description of the man who had held him at gunpoint.

On September 29, Doolin was charged with intimidation with a dangerous weapon in violation of Iowa Code section 708.6 (2015), assault while participating in a felony in violation of Iowa Code section 708.3, and carrying weapons in violation of Iowa Code section 724.4. The case proceeded to a jury trial on August 22, 2017, two years after the incident. Brkovic testified, and during his direct examination, he identified Doolin for the first time as the man who threatened him in his BMW.

> Q. . . . What happened when you pulled into the parking spot? A. When I pulled into the parking spot my passenger got out of the vehicle. The next thing I know I had someone sit in my passenger seat that I had never seen in my life before. He asked me for a ride. And I denied. I said I was going inside of Flirts.
>
> Q. I want to back up a little bit. Do you recognize that person today? A. I do.
>
> Q. Can you point out that person or describe what that person is wearing? A. Dress shirt (indicating).
>
> Q. And is that person sitting in front of you? A. Yes, he is.
>
> Q. And do you recognize that person as the person who got in the front seat of your BMW on August 15th, 2015? A. I do.
>
> MR. WALZ: Your Honor, may the record reflect that the witness has identified the defendant, Tony Doolin?
>
> THE COURT: To be clear, dress shirt with a jacket or no jacket?
>
> THE WITNESS: No jacket.
>
> THE COURT: All right. Any objection, counsel?
>
> MR. HOFFEY: No, Your Honor.

Doolin's trial counsel did not object to Brkovic's first-time, in-court identification but cross-examined him.

> Q. At any point over the last two-plus years has any law enforcement officer shown you a series of photographs asking you to identify the suspect that pointed the gun to your chest? A. No.
>
> Q. Is that a no? A. That is a no.
>
> Q. You're telling this jury after two-plus years that Mr. Doolin is in fact that man. Is that correct? A. That is correct.
>
> Q. Can you tell this jury why you are so certain of that? A. Because I definitely remember his face.
>
> Q. But you didn't tell the officer that. Did you? A. Tell the officer what?
>
> Q. Any descriptive characteristics about the suspect's face. A. I was in shock the whole time.
>
> . . . .
>
> Q. And you were still in shock at 4:30 in the morning when you were talking to the officer? A. Yes, I was.
>
> Q. And because you claim you were in shock, you really couldn't give the officer any descriptive characteristics of the person that put the gun in your chest. A. That's correct.

Defense counsel noted Brkovic had not provided a detailed description the night of the incident.

> Q. And one final question, sir. In front of this jury you pointed to Mr. Doolin and said that he's the guy; correct? A. Yes.
>
> Q. Would you agree with me, sir, that that is a one-man lineup? A. What do you mean one-man lineup?
>
> Q. You don't have anyone to compare Mr. Doolin to, do you? A. I don't need anybody to compare it.
>
> Q. Okay. Is that because Mr. Doolin wouldn't be here unless he was, in fact, the person? Is that what you believe? A. No, I believe I remember his face because he had a gun on my chest.
>
> Q. Okay. But you didn't tell the police that back when it happened. Fair enough? A. He didn't show me a picture. I didn't get to see him then.
>
> Q. And you didn't give any specific descriptions, did you? A. All I remember is his face and the gun.

Q. Okay. And you didn't describe his face in any detail, did you? A. I just remember his face visually.

Menkovic also testified at trial but declined to identify Doolin as the man he saw holding a gun on Brkovic.

Q. . . . When you saw the guy holding the gun at [Brkovic] in the chest area, were you able to get a good look at him? A. I mean, I got a good look at the guy when I walked out, I got a good look at the guy in the car, so I did get a good look at him. If you want me to say that that's the guy, I can't recollect.

Q. And that's what I was going to ask you. From your vantage point and your view are you able to specifically identify the defendant? A. I -- I can't say that was the guy.

Defense counsel asked Menkovic if he could provide any details of the assailant.

Q. Any sort of clothing description, physical description, anything of that nature? A. Honestly, no. Like I said, even that day I didn't -- I didn't remember the color of the gun. And I saw it as I walked out. Like it was the first thing that I saw, you know, and I just -- I couldn't remember the color of it. It's just not something -- I don't know.

Q. Okay. But it's your testimony before the members of this jury that you can't tell this jury that Tony Doolin was the individual holding the gun out in front of Flirts? A. I can't.

Q. And you can't tell the members of this jury that Tony Doolin was the man in your friend's car when he had a gun at his chest? A. I can't.

Q. And you were right there. A. I was right there. I -- I just . . . I thought maybe when we came here if I saw the person it would put a picture in my head. I just, I can't.

Shawn Nolan, a security guard at Flirts, had told the doorman to call the police after witnessing the fight at the entrance and seeing a man with a handgun. When he was called to testify, Nolan identified Doolin in court as the man with the gun.

Q. And when you described earlier the person with the gun, you mentioned -- you said Mr. Doolin. Do you recognize that person in the courtroom today? A. Yes.

Q. Can you describe where he's seated and what he's wearing? A. He is wearing the black and gray shirt with the short haircut.

Q. And is that the person you saw with a gun in front of Flirts on the 15th day of August 2015? A. Yes.

Q. Did you see anyone else with a gun that early morning? A. I did not until we watched the video, and there was a guy that was standing behind me when I was breaking [up] the fight [who] had pulled out a gun that I didn't see at that time.

Later, on cross-examination, Nolan gave more information about the other individual in the video.

Q. The other individual you saw with a gun, how would you describe him? A. He was a taller black man, I believe he was bald, and I remember he was wearing a white sweatshirt, but I didn't see him very often throughout that night.

Q. When you say a white sweatshirt, is that a white hoodie or not a hoodie? A. I believe it was a hoodie.

On redirect, Nolan stated that the person in the hoodie could not be easily mistaken for Doolin.

The prosecutor in his closing argument described Brkovic's first-time, in-court identification of Doolin as direct evidence. Defense counsel countered, "[T]here are major red flags. Major. You know, what happened was what's known as a one-man lineup. There's only one man sitting here. He's on trial." Each argued the weight to be given to the first-time, in-court identification.

The jury returned a verdict finding Doolin guilty on all three counts. On October 3, Doolin filed a motion for a new trial, alleging the verdict was contrary to the weight of the evidence. The district court denied the motion. The district court sentenced Doolin to concurrent, indeterminate terms of incarceration not to exceed ten years for intimidation with a dangerous weapon, five years for assault while participating in a felony, and two years for carrying a weapon.

Doolin filed this direct appeal, which we transferred to the court of appeals. The court of appeals affirmed Doolin's conviction, holding that there was sufficient evidence for the jury to find that Doolin was carrying a firearm while under the influence of alcohol and the district court did not abuse its discretion in denying Doolin's motion for a new trial. The court of appeals determined the record was inadequate to decide Doolin's ineffective-assistance-of-counsel claims and preserved those claims for postconviction proceedings. Doolin applied for further review, which we granted.

## II. Standard of Review.

"On further review, we can review any or all of the issues raised on appeal . . . ." *Cote v. Derby Ins. Agency, Inc.*, 908 N.W.2d 861, 864 (Iowa 2018) (quoting *Papillon v. Jones*, 892 N.W.2d 763, 769 (Iowa 2017)). We choose to limit our review to Doolin's claim that his trial counsel was ineffective for failing to object to his first-time, in-court identification. We let the court of appeals decision stand as the final decision on the remaining issues. *See id.*

Claims of ineffective assistance of counsel are reviewed de novo. *State v. Harrison*, 914 N.W.2d 178, 188 (Iowa 2018).

## III. Analysis.

Doolin contends that his trial counsel was ineffective for failing to object to Brkovic's first-time, in-court identification as a due process violation under the Iowa and Federal Constitutions. We begin our analysis with our rubric for deciding ineffective-assistance-of-counsel claims.

The claimant must prove that his trial counsel failed to perform an essential duty and prejudice resulted. *State v. Clay*, 824 N.W.2d 488, 495 (Iowa 2012) (describing the two-prong test for ineffective-assistance-of-counsel claims set out in *Strickland v. Washington*, 466 U.S. 668, 687, 104

S. Ct. 2052, 2064 (1984)). We presume counsel performed competently unless the claimant proves otherwise by a preponderance of the evidence. *Id.* We measure counsel's performance objectively against the prevailing professional norms after considering all the circumstances. *Id.*

"Trial counsel has no duty to raise an issue that lacks merit . . . ." *State v. Ortiz*, 905 N.W.2d 174, 184 (Iowa 2017); *see also State v. Graves*, 668 N.W.2d 860, 881 (Iowa 2003) ("Trial counsel has no duty to raise an issue that has no merit."). "We do not expect counsel to anticipate changes in the law, and counsel will not be found ineffective for a lack of 'clairvoyance.'" *Millam v. State*, 745 N.W.2d 719, 722 (Iowa 2008). "[I]n situations where the merit of a particular issue is not clear from Iowa law, the test 'is whether a normally competent attorney would have concluded that the question . . . was not worth raising.'" *Id.* (quoting *Graves*, 668 N.W.2d at 881). We have suggested, without deciding, that it could be a breach of duty to fail to urge a position under the state constitution supported by decisions of other state supreme courts and academic literature on an issue pending before the United States Supreme Court on its grant of certiorari. *See State v. Vance*, 790 N.W.2d 775, 786–90 (Iowa 2010). As we explain below, this case is unlike *Vance* because the clear majority rule and Supreme Court precedent strongly support adhering to our long-standing caselaw allowing in-court identifications.[1]

The record must be adequate to resolve an ineffective-assistance-of-counsel claim on direct appeal. *State v. Ary*, 877 N.W.2d 686, 704 (Iowa 2016). We find that this record is adequate to decide whether Doolin's trial counsel had a duty to object to the victim's first-time, in-court

---

[1]Indeed, on October 21, 2019, the Supreme Court denied a defendant's petition for certiorari that sought review of a rejected due process challenge to a first-time, in-court identification. *Garner v. People*, 436 P.3d 1107 (Colo.), *cert. denied*, 140 S. Ct. 448 (2019).

identification because, under established Iowa law and the clear majority of other jurisdictions, such an objection would have been meritless.

To establish prejudice, "the claimant must prove by a reasonable probability that, but for counsel's failure to perform an essential duty, the result of the proceeding would have been different." *Id.* at 705. This does not require a showing that counsel's conduct "more likely than not altered the outcome in the case," but rather that "the probability of a different result is 'sufficient to undermine [our] confidence in the outcome' of the trial." *Id.* (alteration in original) (quoting *Graves*, 668 N.W.2d at 882).

We must decide whether Doolin's trial counsel provided constitutionally deficient representation by failing to object to Brkovic's first-time, in-court identification as inadmissible under the Due Process Clause of the Federal or Iowa Constitution. Doolin relies on several outlier cases from other states, dissents, and inapposite cases challenging pretrial, police-engineered suggestive identification procedures. Brkovic's identification occurred in the presence of the judge, jury, and counsel. Defense counsel's cross-examination and closing argument highlighted the suggestive nature of the in-court identification. We have never held identifications during trial are unconstitutionally suggestive, and we decline to do so now. The weight to be given his testimony is for the jury. We remain with the majority of courts that reject due process challenges to first-time, in-court identifications.

Under our long-standing precedent, even when a pretrial identification is tainted by an impermissibly suggestive procedure, "the same witness may nevertheless identify a defendant at trial if such identification has an independent origin." *State v. Ash*, 244 N.W.2d 812, 814 (Iowa 1976); *see also State v. Webb*, 516 N.W.2d 824, 829–30 (Iowa 1994); *State v. Washington*, 257 N.W.2d 890, 894 (Iowa 1977) (en banc);

*State v. Emery*, 230 N.W.2d 521, 524 (Iowa 1975); *State v. Canada*, 212 N.W.2d 430, 433 (Iowa 1973) (en banc); *State v. Masters*, 196 N.W.2d 548, 551 (Iowa 1972); *State v. Essary*, 176 N.W.2d 854, 858 (Iowa 1970). Brkovic's in-court identification of Doolin is not tainted by any pretrial suggestive identification arranged by police, and his identification clearly has an independent origin—his memory of the face of the man who sat next to him in his car pointing a gun at his chest. Brkovic's testimony is admissible under our precedent. The fact that he did not identify Doolin before trial or give police a detailed description of his assailant "raises a question of credibility, not admissibility." *State v. Hinsey*, 200 N.W.2d 810, 814 (Iowa 1972).

These cases preceded the development of much academic research on the fallibility of eyewitness testimony. *See State v. Shorter*, 893 N.W.2d 65, 81–82 (Iowa 2017) (surveying authorities); *State v. Henderson*, 27 A.3d 872, 896–910 (N.J. 2011) (same and mandating use of expanded jury instruction on eyewitness identifications). *See generally* Gary L. Wells, *Eyewitness Identification Evidence: Science and Reform*, 29 Champion 12 (2005) (outlining the new body of literature regarding mistaken eyewitness identification); John T. Wixted & Gary L. Wells, *The Relationship Between Eyewitness Confidence and Identification Accuracy: A New Synthesis*, 18 Psychol. Sci. Pub. Int. 10 (2017) (describing how over thirty years of research can inform eyewitness-identification accuracy and giving recommendations for implementing pristine testing conditions to improve the criminal justice system). Doolin asks us to revisit our precedent in light of this research.

In *State v. Folkerts*, we stated, "The seating of a defendant next to his or her counsel at the deposition of an eyewitness is so clearly suggestive as to be impermissible." 703 N.W.2d 761, 765 (Iowa 2005). We

noted that "[a]ny identification of the defendant made at the deposition is a pretrial out-of-court identification because neither the judge nor the jury is present when the parties take the deposition." *Id.* With two justices dissenting, we held the defendant could stay out of the room while the deponent was questioned about his ability to describe the assailant.[2] *Id.* at 765–66. Doolin urges us to extend *Folkerts* to the trial setting. We decline to do so. A deposition is not the same as a trial.

*Folkerts* preceded *Perry v. New Hampshire*, which held the safeguards generally available in criminal trials defeat due process objections to the admissibility of eyewitness identifications untainted by suggestive, police-arranged procedures. 565 U.S. 228, 232–33 132 S. Ct. 716, 720–21 (2012). In *Perry*, officers responded to a report that a man was breaking into cars in a parking lot. *Id.* at 233, 132 S. Ct. at 721. As officers interviewed a witness in an apartment overlooking the parking lot, she pointed out her kitchen window to Barion Perry and identified him as the perpetrator while he stood next to a police officer. *Id.* at 233–34, 132 S. Ct. at 721–22. Perry moved to suppress her identification on due process grounds, arguing she "witnessed what amounted to a one-person showup in the parking lot, . . . which all but guaranteed that she would identify him as the culprit." *Id.* at 234–35, 132 S. Ct. at 722.

---

[2]The *Folkerts* majority relied on *United States v. Brown*, 699 F.2d 585, 594 (2d Cir. 1983). 703 N.W.2d at 765. The appellate court in *Brown* stated that upon a proper objection to a proposed first-time, in-court identification, the trial judge "would have been better advised to direct the government to provide a line-up" before the trial testimony. 699 F.2d at 594. The appellate court acknowledged "[a] defendant does not have a constitutional right to a line-up" and determined the failure to require a lineup was not an abuse of discretion nor was the first-time, in-court identification impermissibly suggestive. *Id.* at 593–94. Brown was not entitled to a retrial on those grounds. *Id.* at 594.

The Supreme Court, Justice Ginsburg writing for an eight-Justice majority,[3] held that "the Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when that identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement." *Id.* at 248, 132 S. Ct. at 730. Justice Sotomayor was the lone dissenter. *Id.* at 249, 132 S. Ct. at 730 (Sotomayor, dissenting). Doolin relies on this dissent. The *Perry* majority acknowledged that "[m]ost eyewitness identifications involve some element of suggestion. Indeed, all in-court identifications do." *Id.* at 244, 132 S. Ct. at 727 (majority opinion). Yet the Court determined that "[t]he fallibility of eyewitness evidence does not, without the taint of improper state conduct, warrant a due process rule requiring a trial court to screen such evidence for reliability before allowing the jury to assess its creditworthiness." *Id.* at 245, 132 S. Ct. at 728. In declining to "enlarge the domain of due process," the Court emphasized that "the jury, not the judge, traditionally determines the reliability of evidence." *Id.* The Court explained the Due Process Clause was employed to deter police misconduct, not supplant traditional trial safeguards.

> We have not extended pretrial screening for reliability to cases in which the suggestive circumstances were not arranged by law enforcement officers. . . . Our decisions . . . aim to deter police from rigging identification procedures, for example, at a lineup, showup, or photograph array. When no improper law enforcement activity is involved, we hold, it suffices to test reliability through the rights and opportunities generally designed for that purpose, notably, . . . vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification

---

[3]The *Perry* Court had the benefit of amici curiae that outlined the social science research. *See, e.g.*, Brief for Amicus Curiae Am. Psychological Ass'n in Support of Petitioner, *Perry v. New Hampshire*, 565 U.S. 228 (2012) (No. 10-8974); Brief of the Criminal Justice Legal Found. in Support of Respondent, *Perry*, 565 U.S. 228, 2011 WL 4479078.

and the requirement that guilt be proved beyond a reasonable doubt.

*Id.* at 232–33, 132 S. Ct. at 720–21.[4]

The *Perry* Court detailed how Perry's counsel used "the safeguards generally applicable in criminal trials," quoting from her opening statement, cross-examination, and closing argument that highlighted the unreliability of the witness's identification. *Id.* at 247–48, 132 S. Ct. at 729–30. Given those trial safeguards, the Court held "the introduction of [the eyewitness's] testimony, without a preliminary judicial assessment of its reliability, did not render Perry's trial fundamentally unfair." *Id.* at 248, 132 S. Ct. at 730.

We reach the same conclusion here, for the same reasons. We find *Perry* persuasive and elect to follow it in applying the due process clause of the Iowa Constitution to first-time, in-court eyewitness identifications.[5]

---

[4]The *Perry* Court included among the "protective rules of evidence" Federal Rule of Evidence 403, which allows the exclusion of eyewitness identifications on grounds that the resulting unfair prejudice substantially outweighs the probative value. *Perry*, 565 U.S. at 233, 248, 132 S. Ct. at 721, 729. Iowa Rule of Evidence 5.403 is identical to the Federal Rule. *Compare* Fed. R. Evid. 403, *with* Iowa R. Evid. 5.403. Other courts have noted that this rule of evidence can be used to exclude unreliable first-time, in-court identifications. *See State v. Hickman*, 330 P.3d 551, 568 (Or. 2014) (en banc), *modified on reconsideration*, 343 P.3d 634 (Or. 2015) (en banc) (per curiam). In our view, the availability of Iowa Rule of Evidence 5.403 is another reason we need not constitutionalize evidentiary challenges to first-time, in-court identifications. *See Good v. Iowa Dep't of Human Servs.*, 924 N.W.2d 853, 863 (Iowa 2019) (noting we continue to adhere to the "time-honored doctrine of constitutional avoidance," which "instructs us that we should 'steer clear of "constitutional shoals" when possible'" (quoting *Nguyen v. State*, 878 N.W.2d 744, 751 (Iowa 2016))). Doolin's trial counsel did not object to Brkovic's identification under Iowa rule 5.403, nor does his appellate counsel cite or rely on that evidentiary rule.

[5]Doolin does not argue *Perry* is inconsistent with our earlier due process analysis in *State v. Cox*, 781 N.W.2d 757, 769 (Iowa 2010) (holding "Iowa Code section 701.11 violates the due process clause of the Iowa Constitution as applied in this case because it permits admission of prior bad acts against an individual other than the victim in this case to demonstrate general propensity"). In our view, the *Cox* due process analysis for the admissibility of prior sex offenses is inapposite to the admissibility of eyewitness identifications.

Perry asserted the identification amounted to a "one-person showup," *id.* at 234–35, 132 S. Ct. at 722, and Doolin similarly argued that Brkovic's first-time, in-court identification amounted to a "one-man lineup." As we quoted above, Doolin's trial counsel used his cross-examination[6] and closing argument to argue this point and to highlight the suggestive nature of Brkovic's first-time, in-court identification. The weight of Brkovic's testimony was for the jury, and his testimony, untainted by any improper pretrial police procedure, was admissible without the trial court conducting a preliminary assessment of its reliability. *See id.* at 248, 132 S. Ct. at 730.

The reliability of eyewitness identification can be affected by a number of variables, including lighting, length of time to observe, hats or other items obscuring appearance, stress, weapon focus, witness confidence levels, cross-racial identification, the bystander effect, and cowitness contamination. In our view, these variables are "grist for the jury mill." *Manson v. Brathwaite*, 432 U.S. 98, 116, 97 S. Ct. 2243, 2254 (1977). "Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." *Id.*

Doolin's appellate counsel does not contend trial counsel was ineffective for failing to offer a defense expert to educate the jury on the fallibility of eyewitness testimony. Other courts have recognized that expert testimony may be an appropriate method to address concerns regarding the reliability of eyewitness identifications. *See Commonwealth v. Walker*, 92 A.3d 766, 782–84 (Pa. 2014) (collecting cases). The weight

---

[6]Cross-examination has been recognized as "the 'greatest legal engine ever invented for the discovery of truth.'" *California v. Green*, 399 U.S. 149, 158, 90 S. Ct. 1930, 1935 (1970) (quoting 5 J. Wigmore *Evidence* § 1367 (3d ed. 1940)).

to be given expert testimony is for the jury. *Crow v. Simpson*, 871 N.W.2d 98, 107 (Iowa 2015).

Most courts adjudicating due process claims after *Perry* allow first-time, in-court identifications. *See United States v. Thomas*, 849 F.3d 906, 910 (10th Cir. 2017) ("*Perry* applies not only to pretrial identifications but also to in-court identifications."); *Lee v. Foster*, 750 F.3d 687, 691 (7th Cir. 2014) (determining that a first-time, in-court identification was not impermissibly suggestive); *United States v. Hughes*, 562 F. App'x 393, 398 (6th Cir. 2014) ("[T]he Supreme Court has recently made clear that due process rights of defendants identified in the courtroom under suggestive circumstances are generally met through the ordinary protections in trial."); *United States v. Whatley*, 719 F.3d 1206, 1216 (11th Cir. 2013) ("*Perry* makes clear that, for those defendants who are identified under suggestive circumstances not arranged by police, the requirements of due process are satisfied in the ordinary protections of trial. . . . Due process imposes no requirement of a preliminary examination for an in-court identification."); *Garner v. People*, 436 P.3d 1107, 1120 (Colo. 2019) (en banc) ("[W]e cannot, consistent with *Perry*, conclude that in-court identifications alleged to be suggestive simply because of the ordinary trial setting must be screened rather than subjected to cross-examination and argument before the jury."); *Jeter v. Commonwealth*, 531 S.W.3d 488, 495 (Ky. 2017) (rejecting a due process challenge to a first-time, in-court identification because "[a]bsent the 'taint of improper state action,' *Perry* establishes that the jury and the ordinary rules of trial provided [the defendant] with all the process due him for contesting [the witness's] testimony"); *People v. Palmer*, No. 345188, 2019 WL 6340936, at *4 (Mich. Ct. App. Nov. 26, 2019) (per curiam) (relying on *Perry* and holding that the trial court properly allowed the witness's first-time, in-court identification

because "there was no evidence of improper law enforcement activity or state action related to [the witness's] identification of [the] defendant"); *State v. Ramirez,* 409 P.3d 902, 913 (N.M. 2017) (allowing an in-court identification because *Perry* clarified that due process concerns regarding eyewitness identifications target improper police conduct while the trial setting, including the opportunity for cross-examination, provides sufficient protection); *State v. Berry*, No. 18AP-9, 2019 WL 4727585, at *6 (Ohio Ct. App. Sept. 26, 2019) (relying on *Perry* to hold that "[b]ecause [the witness's first-time,] in-court identification was subject to cross-examination and other trial protections and because there are no allegations of any impermissibly suggestive pre-trial identification procedures, [the defendant] fails to show that [the witness's first-time,] in-court identification of him as the shooter violated his due process rights"); *State v. Hickman,* 330 P.3d 551, 572 (Or. 2014) (en banc) (relying on *Perry* and the lack of any improper state action to hold that an in-court identification did not violate defendant's due process rights), *modified on reconsideration,* 343 P.3d 634 (Or. 2015) (en banc) (per curiam).

The Colorado Supreme Court's 2019 decision in *Garner* is instructive. In that case, a fight broke out between a group of three brothers and another group including James Garner. *Garner,* 436 P.3d at 1108. Shots were fired, injuring the three brothers. *Id.* Garner was charged as the gunman. *Id.* During the pretrial investigation, police showed each brother a photo array that included Garner; none identified Garner as the shooter, and only one brother identified Garner as present at the scene of the shooting. *Id.* Yet during the trial three years later, all three brothers identified Garner as the shooter. *Id.* at 1108–09. One brother stated the shooter's face was something he would never forget,

another was "a hundred percent sure that it was [Garner,]" and the third brother was positive that Garner was the gunman. *Id.*

Garner's trial counsel objected to each first-time, in-court identification of Garner as the shooter, but the trial court overruled her objections. *Id.* Throughout the trial, in her opening statement, and during closing, Garner's counsel challenged the reliability of the brothers' testimony. *Id.* at 1109–10. Defense counsel vigorously cross-examined each brother regarding his failure to identify Garner as the shooter in the pretrial photo array. *Id.* at 1109. In her closing, she argued, "They can't identify James Garner at . . . all [before trial], but when he's sitting in this chair, the one with the arrow over it, that's when they can say they're sure." *Id.* The jury convicted Garner of first-degree assault on one brother, second-degree assault on another, and attempted reckless manslaughter of two of the brothers. *Id.*

On appeal, Garner challenged the first-time, in-court identifications as a violation of his right to due process under the Federal and Colorado Constitutions. *Id.* The court of appeals affirmed his convictions, and the state supreme court granted certiorari. *Id.* at 1110. Garner argued the in-court identifications were the product of impermissibly suggestive circumstances under the multifactor test for challenging pretrial police-engineered identifications set forth by the United States Supreme Court in *Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S. Ct. 375, 382 (1972). *Id.* at 1110. The Colorado Supreme Court disagreed and relying on *Perry*, held,

> [W]here an in-court identification is not preceded by an impermissibly suggestive pretrial identification procedure arranged by law enforcement, and where nothing beyond the inherent suggestiveness of the ordinary courtroom setting made the in-court identification itself constitutionally suspect, due process does not require the trial court to assess the identification for reliability under *Biggers*.

*Id.* at 1120. We agree. Doolin relies on the dissenting opinion, which would have required judicial screening to likely exclude the brothers' in-court identifications. *See id.* at 1125 (Hart, J., dissenting). As noted, the United States Supreme Court, without dissent, denied Garner's petition for certiorari. *Garner,* 436 P.3d 1107 (Colo.), *cert. denied,* 140 S. Ct. 448 (2019). The parties and amici for Garner had thoroughly reviewed the medical and social science on the fallibility of eyewitness identifications in 121 pages of briefing.[7]

Other courts have held that a first-time, in-court eyewitness identification is admissible without relying on *Perry.* In *Ralston v. State,* the Georgia Supreme Court held a preliminary assessment of the identification is unnecessary given the safeguards available at trial.

> The "totality of the circumstances" test for reliability of *Neil v. Biggers* applies to extra-judicial pretrial identification procedures such as lineups, showups and photographic displays, not to the in-court procedures used in this case. Because pretrial identification procedures occur beyond the immediate supervision of the court, the likelihood of misidentification in such cases increases, and courts have required that pretrial identification procedures comport with certain minimum constitutional requirements in order to insure fairness. These extra safeguards are not, however, applicable to Robin Gentle's in-court identification of appellants in this case. Rather, her testimony is subject to the same rules of evidence, witness credibility, and cross-examination as all testimony in a criminal trial.

309 S.E.2d 135, 136–37 (Ga. 1983) (citation omitted); *see also Byrd v. State,* 25 A.3d 761, 767 (Del. 2011) (en banc) (rejecting challenge to first-time, in-court identification and holding that the inherent suggestiveness of a trial setting "does not rise to the level of constitutional concern" and

---

[7] *See* Brief of Scholars of Law, Psychology, Neuroscience, and Other Fields as Amicus Curiae in Support of Petitioner, *Garner v. Colorado,* 140 S. Ct. 448 (2019) (No. 19-75), 2019 WL 3854682; Brief of the Nat'l Ass'n of Criminal Def. Lawyers as Amici Curiae in Support of Petitioner, *Garner,* 140 S. Ct. 448, 2019 WL 3933781.

that "the remedy for any alleged suggestiveness of an in-court identification is cross-examination and argument"); *Jeter v. State*, 888 N.E.2d 1257, 1266 (Ind. 2008) (rejecting defendant's challenge to a witness's first-time, in-court identification two and a half years after the crime and finding the identification was not unduly suggestive and "was a matter of weight and credibility for the jury to consider"); *Galloway v. State*, 122 So. 3d 614, 664 (Miss. 2013) (en banc) ("The trial itself affords the defendant adequate protection from the general inherent suggestiveness present at any trial. The defendant receives the full benefit of a trial by jury, presided over by an impartial judge, with representation by counsel, and witnesses subject to oath and cross-examination."); *State v. King*, 934 A.2d 556, 560–61 (N.H. 2007) (declining to require a prescreening and stating "[t]he inherent suggestiveness in the normal trial procedure employed here does not rise to the level of constitutional concern"); *People v. Morales*, 109 N.Y.S.3d 650, 651 (App. Div. 2019) ("In cases where . . . the defendant is identified in court for the first time, 'the defendant is not deprived of a fair trial because the defense counsel is able to explore weaknesses and suggestiveness of the identification in front of the jury.' " (quoting *People v. Medina*, 617 N.Y.S.2d 491, 492–93 (App. Div. 1994)));[8] *State v. Ramirez*, Nos. 16CA95, 16CA96, 2017 WL 7689959, at

---

[8]Doolin relies on an older case from New York's highest court regarding showups, *People v. Adams*, 423 N.E.2d 379 (N.Y. 1981), as applying a per se rule of exclusion for unnecessarily suggestive identification procedures. In *People v. Marte*, the same court held that "no similar per se rule applies to an identification in which the police are not involved." 912 N.E.2d 37, 38 (N.Y. 2009). In an opinion that aligns with the not-yet-decided *Perry*, the *Marte* court stated,

> Ordinarily, where the need to regulate police conduct does not justify an exclusionary rule, our system relies on juries to assess the reliability of eyewitnesses, aided by cross-examination, by the arguments of counsel, and by whatever other evidence supports or contradicts the witnesses' testimony.

*Id.* at 41.

*6–7 (Ohio Ct. App. Feb. 14, 2017) (rejecting defendant's argument that first-time, in-court identifications are inherently suggestive and unreliable and declining to follow the new Connecticut precedent requiring prescreening); *Commonwealth v. Janqdhari*, No. 2762EDA2018, 2019 WL 7290508 (Pa. Super. Ct. Dec. 30, 2019) (rejecting defendant's invitation to adopt restrictions on first-time, in-court identifications in new Connecticut and Massachusetts precedent and reiterating that "[t]he fact that [the witness] could not identify [the defendant] earlier is relevant only to the weight and credibility of [his or her] testimony" (quoting *Commonwealth v. Zabala*, 449 A.2d 583, 587 (Pa. Super. Ct. 1982))); *State v. Lewis*, 609 S.E.2d 515, 518 (S.C. 2005) ("We conclude, as the majority of courts have, that *Neil v. Biggers* does not apply to in-court identifications and that the remedy for any alleged suggestiveness of an in-court identification is cross-examination and argument.").

Doolin urges us to disregard the well-established majority rule and instead follow the Connecticut Supreme Court's decision in *State v. Dickson*, which held that "first time in-court identifications, like in-court identifications that are tainted by an unduly suggestive out-of-court identification, implicate due process protections and must be prescreened by the trial court." 141 A.3d 810, 824 (Conn. 2016). The *Dickson* court stated,

> [W]e are hard-pressed to imagine how there could be a *more* suggestive identification procedure than placing a witness on the stand in open court, confronting the witness with the person who the state has accused of committing the crime, and then asking the witness if he can identify the person who committed the crime. If this procedure is not suggestive, then *no* procedure is suggestive.

*Id.* at 822–23 (footnote omitted). The *Dickson* court created a multistep process that took five pages to describe and now governs how Connecticut

courts must prescreen first-time, in-court identifications. *Id.* at 835–40. While acknowledging "a number of courts have concluded otherwise," *id.* at 827 & n.14, the *Dickson* court concluded "that this is an issue for which the arc of logic trumps the weight of authority," *id.* at 827.

Three justices disagreed, with two citing *Perry* to conclude that first-time, in-court identifications

> pass[ed] constitutional scrutiny . . . as long as the defendant is afforded the traditional protections of our adversary system, such as confrontation, the attendant right to cross-examine state witnesses, closing argument, jury instructions, the presumption of innocence, and the government's burden to prove guilt beyond a reasonable doubt."

*Id.* at 845 (Zarella, J., concurring in the judgment); *see also id.* at 865 (Robinson, J., concurring) (concluding the majority's constitutional analysis was unnecessary given the court's determination that the admission of the eyewitness testimony was harmless error).

In *Commonwealth v. Crayton*, the Supreme Judicial Court of Massachusetts overturned its precedent and held first-time, in-court identifications are admissible "only where there is 'good reason' " such as the victim already knew the defendant. 21 N.E.3d 157, 169 (Mass. 2014). The *Crayton* court adopted the new rule under its common law authority without deciding whether the state constitution's due process clause required that result. *Id.* at 169 n.16.

We view *Crayton* and *Dickson* as outliers, and the *Dickson* screening criteria for judges as unduly complex and restrictive. Many Iowa criminal jury trials involve first-time, in-court eyewitness identifications. Excluding such testimony would effectively deny justice to some victims.

Doolin also relies on *State v. Dubose*, which involved a challenge to an out-of-court showup procedure. 699 N.W.2d 582 (Wis. 2005), *overruled by State v. Roberson*, 935 N.W.2d 813, 816 (Wis. 2019). There,

relying on social science research, the Wisconsin Supreme Court overruled its long-standing precedent to adopt a new test for the admissibility of showup identifications it found "inherently suggestive" and, therefore, inadmissible "unless, based on the totality of the circumstances, the procedure was necessary." *Id.* at 594. A first-time, in-court identification differs from a showup. In any event, the Wisconsin Supreme Court has recently overruled *Dubose*. *See State v. Roberson*, 935 N.W.2d 813, 816 (Wis. 2019).

The *Roberson* court soundly rejected *Dubose* and critiqued its departure from at least twenty-six years of precedent and its reliance on social science research. The *Roberson* court recognized that "social science research cannot be used to define the meaning of a constitutional provision," elaborating,

> As Justice Scalia explained, the judiciary is not in a good position to judge social values or social science. When social science is disputed, the institutional parameters of the judiciary are amplified. It is the legislature that is structured to assess the merits of competing policies and ever-changing social science assertions.
>
> It is no surprise that, with mounds of research available, the State in the dispute now before us has identified social science that supports its position. E.g., John Wixted & Gary Wells, The Relationship Between Eyewitness Confidence and Identification Accuracy: A New Synthesis, 18 Psychol. Sci. in the Pub. Int. 10 (2017).
>
> Furthermore, categorical rules of exclusion, based on social science, are the antithesis of justice because "one of the major tenets in the administration of justice" is "the presentation of reliable, relevant evidence at trial."

*Id.* at 820–21 (quoting *Dubose*, 699 N.W.2d at 607 (Roggensack, J., dissenting)).

The *Roberson* court further observed that "[a] state court does not have the power to write into its state constitution additional protection that is not supported by its text or historical meaning." *Id.* at 824. The

*Roberson* court noted *Dubose* "crafted a rule of constitutional law, largely based on social science reports that it found persuasive" and "created the capacity to prevent identifications of perpetrators of crimes when under the totality of the circumstances surrounding the identifications, they were reliable." *Id.* at 825. Wisconsin law provides no support for Doolin today.

We elect to adhere to our precedent and remain with the majority rule allowing first-time, in-court identifications. That rule reflects "the profound respect that our system of justice holds for the role of juries in the adjudicative process." *Hickman*, 330 P.3d at 564. "The jury may be an imperfect vehicle for assessing eyewitness evidence, but it is the vehicle for resolving guilt or innocence found in the Constitution. We can have little confidence that a judge-made substitute will do better." Lawrence Rosenthal, *Eyewitness Identification and the Problematics of Blackstonian Reform of the Criminal Law*, 110 J. Crim. L. & Criminology 181, 243 (2020). We determine that Doolin's trial counsel did not provide constitutionally deficient representation for failing to object to Brkovic's trial testimony. Such an objection would have been meritless.

**IV. Disposition.**

For these reasons, we vacate the court of appeals decision on Doolin's due process claim for his first-time, in-court identification, affirm the court of appeals decision on the remaining issues, and affirm the district court judgment and sentence.

**DECISION OF COURT OF APPEALS VACATED IN PART AND AFFIRMED IN PART; DISTRICT COURT JUDGMENT AFFIRMED.**

All justices concur except Appel, J., who dissents, and McDonald, J., who takes no part.

**APPEL, Justice (dissenting).**

"[T]here is almost *nothing more convincing* [to a jury] than a live human being who takes the stand, points a finger at the defendant, and says 'That's the one!'" *Watkins v. Sowders*, 449 U.S. 341, 352, 101 S. Ct. 654, 661 (1981) (Brennan, J., dissenting) (quoting Elizabeth F. Loftus, *Eyewitness Testimony* 19 (1979) (emphasis added)). Yet, retrospective study of wrongful convictions uncovered through DNA analysis demonstrates that erroneous identifications are the leading cause of wrongful conviction. This presents the law with a profound problem that challenges the very integrity of our criminal justice system: the most convincing testimony is often highly unreliable.

Why is such convincing eyewitness testimony so often wrong? Any court system concerned about fundamental fairness in criminal justice should want to explore the issue thoroughly, understand the science behind eyewitness identification in depth, and fashion its doctrine to mitigate the risks of the gross injustice that arises from wrongful convictions.

Among other things, the science of eyewitness identification reveals the following: that eyewitness identification is at best a questionable enterprise, that the ability to identify an assailant threatening a person with a handgun is dramatically impaired, that memory dramatically declines two hours after an incident, that memory *never* improves over time, and that one person showups are inherently highly suggestive and unreliable.

None of this science is canvassed in the majority opinion. It is simply ignored in favor of fawning admiration for the demonstrably flawed cases of the United States Supreme Court and rejection of a body of law

developing in state courts that incorporates eyewitness science into its constitutional jurisprudence.

Because the approach of the majority unnecessarily increases the risks of wrongful convictions, does not address what we know about the science of eyewitness testimony, is inconsistent with extant Iowa caselaw on due process, and allows convictions based on eyewitness identifications that science tells us are likely to be substantially unreliable, I respectfully dissent.

## I. Introduction.

My analysis begins with a review of the science of eyewitness identification. In short: it is extremely troubling. Cumulatively, the now very large body of research demonstrates major problems associated with eyewitness identification. No conscientious court can consider due process questions arising from eyewitness identification without a thorough knowledge and grasp of this now very large body of work.

Next, I review the cases of the United States Supreme Court. Alarmingly, the United States Supreme Court cases are far out of sync with developing science on eyewitnesses and are not persuasive for a court that wants its doctrine to match objective reality. Specifically, I note that the traditional framework established in *Neil v. Biggers*, 409 U.S. 188, 93 S. Ct. 375 (1972), is fundamentally flawed. I then review how the decision in *Perry v. New Hampshire*, 565 U.S. 228, 132 S. Ct. 716 (2012), is analytically unsound and inconsistent with current eyewitness science. Both of these wobbly precedents should not be followed under article I, section 8 of the Iowa Constitution.

Next, I turn to cases in a number of jurisdictions that forthrightly incorporate eyewitness science into their caselaw. These cases demonstrate that if the science is applied within a due process framework,

in-court eyewitness identifications, particularly those obtained by showup-type identifications that occur after the passage of time, are prime candidates for exclusion as inadmissible evidence.

Finally, I consider the particular issues raised in this case. First, I discuss whether it was ineffective assistance for counsel to fail to seek exclusion of Brkovic's identification through a one person, in-court showup two years after the fact. I also discuss whether Doolin received ineffective assistance of counsel when his lawyer failed to seek suppression of the in-court identification and failed to seek an instruction on the use of eyewitness identification.

**II. The Historical Evolution of the Science of Eyewitness Identification.**

**A. Introduction.** Recent cases reviewing the due process framework for evaluation of the reliability and subsequent admissibility of eyewitness testimony that was developed in the late 1960s and 1970s fall into two distinct camps. One body of caselaw canvasses the contours of several decades of eyewitness science. *See, e.g., Young v. State*, 374 P.3d 395, 417–26 (Alaska 2016); *State v. Guilbert*, 49 A.3d 705, 720–25 (Conn. 2012); *Brodes v. State*, 614 S.E.2d 766, 770–71 (Ga. 2005); *State v. Cabagbag*, 277 P.3d 1027, 1034–39 (Haw. 2012); *Commonwealth v. Gomes*, 22 N.E.3d 897, 907–17 (Mass. 2015); *State v. Henderson*, 27 A.3d 872, 896–913 (N.J. 2011); *State v. Lawson*, 291 P.3d 673, 685–88 (Or. 2012) (en banc); *State v. Long*, 721 P.2d 483, 488–91 (Utah 1986). Without fail, each state court that has engaged in a review of eyewitness science in the past two decades or so has come to the conclusion that the prior due process framework is inconsistent with consensus science and must be revised.

On the other hand, a number of the courts that have been asked to consider changes in the due process framework for eyewitness identification developed fifty years ago by the United States Supreme Court precedents have decided to simply stand pat. In most of those cases, these courts simply declined to examine the consensus eyewitness science. *See, e.g., Small v. State*, 211 A.3d 236, 250–55 (Md. 2019); *State v. Washington*, 189 A.3d 43, 55–58 (R.I. 2018); *State v. Doap Deng Chuol*, 849 N.W.2d 255, 261–62 (S.D. 2014).

The later path of failing to consider three decades of development in eyewitness science is unacceptable. The law cannot allow historic seat-of-the-pants judgments later proven to be misleading or inaccurate to remain immutable when consensus science shows those judgments to be so problematic that criminal convictions become unreliable.

As Justice Sutherland noted long ago, the criminal justice system has two goals: convicting the guilty and protecting the innocent. *Berger v. United States,* 295 U.S. 78, 88, 55 S. Ct. 629, 633 (1935). A claim that social science demonstrates that the law is no longer advancing these twin goals must be taken seriously. While differing judgments about the implications of science are not only expected but even desirable in a federal legal system, what is not acceptable is willful blindness to the developments of science. When reputable scientists declare that "there are more convictions than there are accurate identifications" it is time to sit up and pay attention. Brian L. Cutler & Steven D. Penrod, *Mistaken Identification: The Eyewitness, Psychology and the Law* 186 (1995) [hereinafter Cutler & Penrod, *Mistaken ID*] (citing Gary L. Wells et al., *Accuracy, Confidence, and Juror Perceptions in Eyewitness Identification*, 64 J. Applied Psychol. 440, 440–48 (1979)). Plainly, a review of the science is a prerequisite for any meaningful evaluation of a challenge to the fifty-

year-old traditional due process framework for the evaluation of eyewitness testimony.

**B. Historical Commentary on Eyewitness Testimony.** The notion that an eyewitness identification may be unreliable is not new. As one skeptical judge noted more than 150 years ago, "I would sooner trust the smallest slip of paper for truth, than the strongest and most retentive memory ever bestowed on mortal man." *Miller v. Cotten*, 5 Ga. 341, 349 (1848). Many years later, then Professor Felix Frankfurter, in his classic volume on the trial of Sacco and Vanzetti, exclaimed,

> What is the worth of identification testimony even when uncontradicted? The identification of strangers is proverbially untrustworthy. The hazards of such testimony are established by a formidable number of instances in the records of English and American trials. These instances are recent—not due to the brutalities of ancient criminal procedure.

*United States v. Wade*, 388 U.S. 218, 228, 87 S. Ct. 1926, 1933 (1967) (quoting Felix Frankfurter, *The Case of Sacco and Vanzetti* 30 (1927)).

In the 20th century, there was a smattering of scholarly efforts to establish an empirical basis for occasional judicial and scholarly observations about the unreliability of eyewitness identifications. In 1908, Harvard psychologist Hugo Münsterberg published *On the Witness Stand.* In this volume, Münsterberg presented empirical evidence that eyewitness testimony was often inaccurate. Hugo Münsterberg, *On the Witness Stand: Essays on Psychology and Crime* (1908). In 1932, Edwin M. Borchard documented sixty-five cases of miscarriage of justice in *Convicting the Innocent: Sixty Five Actual Errors of Criminal Justice.* Edwin M. Borchard, *Convicting the Innocent: Sixty Five Actual Errors of Criminal Justice* (1932), *in Convicting the Innocent and State Indemnity for Errors of Criminal Justice* 44 (Justice Inst. 2013). Borchard concluded that the convictions were

based on misidentification by eyewitnesses in forty-four of the sixty-five cases. *Id.* at 283.

If eyewitness testimony is notoriously unreliable, and much more unreliable than an ordinary juror likely believes, what is to be done? Is there a good way we can separate acceptably reliable identifications from unacceptably unreliable identifications, present to the jury only identifications that are reasonably reliable, and suppress identifications that are simply too tainted to justify the risk of error? Neither Münsterberg nor Borchard offered compelling answers to these important questions.

**C. Explosion in the Science of Eyewitness Testimony in Recent Decades.** Aside from Münsterberg and Borchard, eyewitness identification did not receive much scholarly consideration until the late 1960s and early 1970s. Beginning about this time, researchers developed a rapidly accelerating and expanding body of science related to eyewitness identification. Iowa State University Professor Gary Wells has published numerous articles and studies on the topic and has emerged as one of the few nationally recognized scholars challenging the manner in which the law treats eyewitness identifications. *See, e.g.*, Gary L. Wells et al., *Accuracy, Confidence, and Juror Perceptions in Eyewitness Identification*, 64 J. Applied Psychol. 440 (1979) [hereinafter Wells, *Juror Perceptions*]; Gary L. Wells, *Applied Eyewitness-Testimony Research: System Variables and Estimator Variables*, 36 J. Personality & Soc. Psychol. 1546 (1978) [hereinafter Wells, *Variables*]; Gary L. Wells et al., *Effects of Expert Psychological Advice on Human Performance in Judging the Validity of Eyewitness Testimony*, 4 Law & Hum. Behav. 275 (1980); Gary L. Wells et al., *Eyewitness Identification Procedures: Recommendations for Lineups and Photospreads*, 22 Law & Hum. Behav. 603 (1998) [hereinafter Wells, *Lineups and Photospreads*]; Gary L. Wells, *Eyewitness Identification:*

*Systemic Reforms,* 2006 Wis. L. Rev. 615; Gary L. Wells et al., *Guidelines for Empirically Assessing the Fairness of a Lineup,* 3 Law & Hum. Behav. 285 (1979); Gary L. Wells & Deah S. Quinlivan, *Suggestive Eyewitness Identification Procedures and the Supreme Court's Reliability Test in Light of Eyewitness Science: 30 Years Later,* 33 Law & Hum. Behav. 1 (2009) [hereinafter Wells & Quinlivan, *Suggestive Procedures*]. Over time, these studies have identified a number of factors that increase the risk of inaccurate eyewitness identification. Although there is always room for additional research on the margins, there is now a scholarly consensus on a number of core concepts that must be recognized in any court that takes the question of reliability of its verdicts seriously.[9]

---

[9]Courts have extensively used the results of scientific research in the context of eyewitness testimony. *See, e.g., Young,* 374 P.3d 395, 417–26 (exploring scientific eyewitness identification research); *Guilbert,* 49 A.3d at 734–40 (evaluating eyewitness identification); *Henderson,* 27 A.3d at 889–914 (canvassing scientific eyewitness-testimony research extensively); *Lawson,* 291 P.3d 673, 685–88 (applying eyewitness identification science within the framework of the courts); *see also United States v. Bartlett,* 567 F.3d 901, 906 (7th Cir. 2009) (applying the science of confidence-accuracy relationship and memory decay); *United States v. Brownlee,* 454 F.3d 131, 142–44 (3d Cir. 2006) (citing the "inherent unreliability" of eyewitness identifications and accuracy-confidence relationship); *United States v. Smith,* 621 F. Supp. 2d 1207, 1215–17 (M.D. Ala. 2009) (surveying cross-racial identifications, impact of high stress, and feedback); *State v. Chapple,* 660 P.2d 1208, 1220–22 (Ariz. 1983) (en banc) (applying available science on memory decay, stress, feedback, and confidence-accuracy); *People v. McDonald,* 690 P.2d 709, 719–27 (Cal. 1984) (en banc) (exploring discretion of trial court regarding admission of expert testimony on reliability of eyewitness testimony), *overruled on other grounds by People v. Mendoza,* 4 P.3d 265, 277–78 (Cal. 2000); *Benn v. United States,* 978 A.2d 1257, 1273–1284 (D.C. 2009) (reviewing system and estimator identification variables in a court context); *Brodes,* 614 S.E.2d at 770 (citing studies regarding witness confidence and certainty); *People v. LeGrand,* 867 N.E.2d 374, 378–79 (N.Y. 2007) (reviewing confidence-accuracy relationship, feedback, and confidence malleability); *State v. Copeland,* 226 S.W.3d 287, 299–300, 302 (Tenn. 2007) (finding trial court erred by not admitting expert testimony on reliability of eyewitness identification); *State v. Clopten,* 223 P.3d 1103, 1108–11 (Utah 2009) (citing research and multiple systems and estimator variables); *State v. Dubose,* 699 N.W.2d 582, 591–93 (Wis. 2005) (canvassing scientific literature), *overruled by State v. Roberson,* 935 N.W.2d 813, 816 (Wis. 2019).

**III. Measuring the Dimension of the Problem of Eyewitness Misidentification.**

**A. Estimates Developed Through Social Science Research.** Among other things, the scholarly work has raised a threshold question: how serious is the problem of eyewitness identification? It seems obvious that the greater the frequency of errors in identification, the more pressure there is on the legal system to develop a sensible method of addressing the problem.

The results of the eyewitness research over the past three decades or so can only be characterized as quite disturbing. For example, a meta-analysis [combined analysis of multiple studies] of ninety-four experiments revealed that after nonsuggestive lineups, 46% of witnesses choose the perpetrator correctly, 33% decline to choose, and 21% choose someone who was innocent. Samantha L. Oden, Note, *Limiting First-Time In-Court Eyewitness Identifications: An Analysis of* State v. Dickson, 36 Quinnipiac L. Rev. 327, 334 (2018). In another meta-analysis, research considered eyewitness responses where the perpetrator was not part of the lineup and found roughly half of witnesses picked someone who was an innocent filler. *Id.*

In one illustrative study, convenience store clerks were exposed to bizarre behavior by "customers." Noah Clements, *Flipping a Coin: A Solution for Inherent Unreliability of Eyewitness Identification Testimony*, 40 Ind. L. Rev. 271, 272–73 (2007) [hereinafter Clements]. Two hours later, only 34.2% of the clerks were able to identify the customer in a nonsuggestive photo array. *Id.* Twenty-four hours later, the identification percentage declined to 7.8%. In this study, the initial rate of identification was fairly low and deteriorated rapidly. *Id.*

There are literally dozens and dozens of studies that consistently show a high rate of error in eyewitness identifications even under favorable conditions. As summarized by the American Psychological Association (APA) in an amicus brief filed in *Perry*, studies have "consistently found that the rate of incorrect identifications is roughly 33 percent." *See* Brief for Amicus Curiae Am. Psychological Ass'n in Support of Petitioner at 3, *Perry*, 565 U.S. 228, 132 S. Ct. 716 (No. 10-8974), 2011 WL 3488994 at *3 [hereinafter APA Amicus]. The rate of incorrect identification in live lineups show similarly unreliability. *See, e.g.*, Bruce W. Behrman & Sherrie L. Davey, *Eyewitness Identification in Actual Criminal Cases: An Archival Analysis*, 25 Law & Hum. Behav. 475, 480–82 (2001) (concluding a 24% error rate in fifty-eight live lineups studied); Tim Valentine et al., *Characteristics of Eyewitness Identification that Predict the Outcome of Real Lineups*, 17 Applied Cognitive Psychol. 969, 974 (2003) (finding between 19%-22% error rate in live lineups); Daniel B. Wright & Anne T. McDaid, *Comparing System and Estimator Variables Using Data from Real Line-Ups*, 10 Applied Cognitive Psychol. 75, 77 (1996) (finding 19.9% misidentification in live lineups).

With results like these, eyewitness identification is sometimes referred to as a "coin flip" rather than an objective process. *See* Clements, 40 Ind. L. Rev. at 271. The unreliability of eyewitness identifications is not a concept found exclusively in the rarified atmosphere of the academe. As noted by the IACP National Law Enforcement Policy Center, "Of all investigative procedure employed by police in a criminal case, probably none is less reliable than the eyewitness identification." IACP Nat'l Enf't Policy Ctr., *Eyewitness Identification* 5 (rev. Sept. 2010).

Authoritarians inclined to defend convictions regardless of guilt or innocence may not be disturbed by the undisputed science on the theory

that a crime victim deserves a conviction of the best available suspect. But anyone who believes that reliability should be an important part of the criminal justice process and isn't concerned by these persistent inaccuracies is unthinking, or unconscious.

**B. Confirmation of Scope of Problem of Eyewitness Misidentification in Retrospective DNA Studies.** The problematic nature of eyewitness identifications has been confirmed in recent years by retrospective study of cases involving DNA exonerations. In these cases, it is virtually certain that the individuals convicted of the crimes were, in fact, innocent. In a recent retrospective study of DNA exonerations, the author concluded that 76% of all convictions shown to be wrongful by DNA evidence were based on inaccurate eyewitness identifications. Brandon L. Garrett, *Convicting the Innocent: Where Criminal Prosecutions Go Wrong* 48 (2011). Another retrospective of exonerations found that faulty eyewitness identification exceeds all other causes as the reason for wrongful conviction. Samuel R. Gross et al., *Exonerations in the United States 1989 Through 2003*, 95 J. Crim. L. & Criminology 523, 542, 544 (2003) [hereinafter Gross] (finding "the most common cause of wrongful convictions is eyewitness misidentification," with misidentification accounting for 50% and 88% of wrongful convictions for murder and rape, respectively).

One of the most prominent DNA exoneration cases illustrates the nature of the problem. In the case of Ron Cotton, the victim identified him as her rapist in a photo array, claiming to have studied "every single detail on the rapist's face" at the time of the assault. Clements, 40 Ind. L. Rev. at 275–76. Later DNA evidence demonstrated that Cotton was not the culprit, and the real perpetrator was identified. *Id.* at 276. When shown the real culprit, the victim declared, "I have never seen him in my life." *Id.*

*See generally* William J. Morgan, Jr., *Justice in Foresight: The Past Problems with Eyewitness Identification and Exoneration by DNA Technology*, 3 S. Region Black Students Ass'n L.J. 60 (2009) (listing a number of cases where highly certain eyewitness testimony was proven incorrect by DNA technology).

DNA exonerations, of course, usually involve cases of sexual assault. Gross, 95 J. Crim. L. & Criminology at 530–31. In most robbery cases, DNA evidence has not been available. *Id.* There is reason to believe, however, that there is a greater risk of eyewitness misidentification in robberies than other crimes because robberies are often committed by strangers to the victim and the robber is usually within the victim's physical proximity for a short period of time. *Id.*

**C. Summary.** The first step in addressing a problem is recognizing its existence. With respect to eyewitness identification, there can be no doubt that the problem of misidentification by well-meaning witnesses poses an urgent problem for a legal system which is designed with the twin goals of convicting the guilty and protecting the innocent.

**IV. Identification and Importance of Key Variables that Contribute to Unreliable Eyewitness Identifications in One Person Showups.**

**A. Introduction.** The massive scientific literature on eyewitness identification has sought to develop an understanding of the general principles of human memory and to identify key variables that contribute to misidentification. Although there are many potential lines for additional fruitful scientific inquiry, a number of key variables have clearly emerged from the decades of professional inquiry. For many years, the literature generally divides the variables into two categories: estimator variables and

system variables. *See* Wells, *Variables,* 36 J. Personality & Soc. Psychol. at 1548.

No attempt is made here to catalogue all relevant variables, but a nonexhaustive review provides the context for considering the proper legal framework for evaluating the reliability of eyewitness identifications. Further, much of the descriptions provided below may be found in the rich eyewitness caselaw and was relied upon in the development of the summary below. *See, e.g.*, *Young,* 374 P.3d at 417–26; *Henderson*, 27 A.3d at 894–909; *Lawson,* 291 P.3d at 706–11.

**B. General Principles of Human Memory.**

1. *Human memory is not like the retrieval of photographic images.* Many believe that eyewitness identification is like retrieving a photo from an album, except that the photo album is your memory. But the science on eyewitness identification consistently demonstrates that this is not the case. Rather than the common perception that memory works like a video recorder, the science around eyewitness identification shows us that memory is impacted by a wide range of estimator and systems variables at the perception, retention, and retrieval stages of identification. *See* Elizabeth F. Loftus et al., *Eyewitness Testimony: Civil and Criminal* § 2-2, at 14 (5th ed. 2013) [hereinafter Loftus et al*., Civil and Criminal*].

2. *Human memory decays quickly and never improves over time.* When it comes to eyewitness identifications, human memory declines rapidly over time. The rate of memory loss for an unfamiliar face is greatest right after the encounter and then tends to level off. *See id.* §3-2[a], at 51–54; Brian L. Cutler, *A Sample of Witness, Crime, and Perpetrator Characteristics Affecting Eyewitness Identification Accuracy*, 4 Cardozo Pub. L., Pol'y & Ethics J. 327, 336 (2006) [hereinafter Cutler, *ID Characteristics*]; Kenneth A. Deffenbacher et al., *Forgetting the Once-Seen*

*Face: Estimating the Strength of an Eyewitness's Memory Representation*, 14 J. Experimental Psychol.: Applied 139, 147–48 (2008).

### C. Estimator Variables.

1. *Illumination at time of exposure affects human memory.* "Dark lighting conditions" has been described as one of the "classic variables" that reduces the accuracy of eyewitness identification. Sandra Guerra Thompson, *Beyond a Reasonable Doubt? Reconstructing Uncorroborated Eyewitness Identification Testimony*, 41 U.C. Davis L. Rev. 1487, 1493 (2005); *see also* Loftus et al., *Civil and Criminal* §2-4, at 17–19; Marloes de Jong et al., *Familiar Face Recognition as a Function of Distance and Illumination: A Practical Tool for Use in the Courtroom*, 11 Psychol., Crime & L. 87, 87 (2005) [hereinafter de Jong et al., *Familiar Face Recognition*]. The degree of illumination at the time of an encounter is a factor that impacts human memory. The darker the environment, the less reliable an eyewitness identification. de Jong et al., *Familiar Face Recognition*, 11 Psychol., Crime & L. at 95 (finding that while facial recognition at 30 lux is generally reliable, facial recognition at the same distance between 3–10 lux is questionable).

2. *Time of exposure.* Time of exposure may also affect human memory. All other things being equal, the longer the exposure and opportunity to study an image, the greater the likelihood of an accurate identification. *See* Brian H. Bornstein et al., *Effects of Exposure Time and Cognitive Operations on Facial Identification Accuracy: A Meta-Analysis of Two Variables Associated with Initial Memory Strength*, 18 Psychol., Crime & L. 473, 486 (2012) (finding that short exposure time negatively impacts eyewitness memory). Conversely, the shorter the exposure, any identification is likely to be less reliable. *Id.* at 482.

It is noteworthy, however, that victims experiencing arousal and stress are likely to overestimate the length of time of the event. *See* Loftus et al., *Civil and Criminal* §2-5, at 20; Sven-Äke Christianson & Elizabeth F. Loftus, *Memory for Traumatic Events*, 1 Applied Cognitive Psychol. 225, 236 (1987); Elizabeth F. Loftus et al*., Time Went by So Slowly: Overestimation of Event Duration by Males and Females,* 1 Applied Cognitive Psychol. 1, 4–5 (1987). The scientific literature paints a clear picture of time-exposure overestimation of those reporting stressful events.

3*. Hats or other obstacles to vision as an accurate identification inhibitor.* The science demonstrates that eyewitness identification is complicated when full vision of the face is impaired. For instance, researchers in a 1987 study determined that wearing a hat inhibits accurate eyewitness identification, dropping identification accuracy from 50% to about 25%. Margaret A. Hagan & Sou Hee Yang, *How Can So Many Be Wrong? Making the Due Process Case for an Eyewitness Expert* 9 (2019). This decrease in identification accuracy occurred without any corresponding decrease in witness confidence in the identification. *Id.* A later review of six studies with more than 1300 witnesses showed again that identification accuracy was significantly reduced when perpetrators wore hats that masked hair and hairline. *Id.*; *see also* Cutler, *ID Characteristics*, 4 Cardozo Pub. L., Pol'y & Ethics J. at 332; Brian L. Cutler et al., *The Reliability of Eyewitness Identification: The Role of System and Estimator Variables*, 11 Law & Hum. Behav. 233, 240 (1987).

4. *Stress as an accurate identification inhibitor.* It is commonly thought by lay persons that in a highly stressful situation, the face of a perpetrator can be "burned into" a witness memory. This manifests itself at trial with declarations like "I'll never forget the face" of the attacker. The

eyewitness science, however, is flatly to the contrary. As demonstrated by the research, even where no stress is present, eyewitness identification is often inaccurate. With stress, however, the studies consistently show that the accuracy of eyewitness identification is not enhanced, but declines. *See* Loftus et al., *Civil and Criminal* §2-9, at 28–32; Kenneth A. Deffenbacher et al., *A Meta-Analytic Review of the Effects of High Stress on Eyewitness Memory*, 28 Law & Hum. Behav. 687, 694 (2004); Charles A. Morgan III et al., *Accuracy of Eyewitness Memory for Persons Encountered During Exposure to Highly Intense Stress,* 27 Int'l J.L. & Psychiatry 265, 274 (2004).

5. *Weapon focus as an accurate identification inhibitor.* Another commonly held view is that if the perpetrator has a weapon, concentration sharpens and the likelihood that the victim will be able to make an accurate identification increases. Again, the research comes to an opposite conclusion. Commonly described as weapon focus, the fact that a perpetrator brandishes a weapon tends to decrease the accuracy of eyewitness identification as the victim focuses not on the face of the perpetrator or other identifying characteristics, but on the weapon. *See* Loftus et al., *Civil and Criminal* §2-10, at 32–35; Nancy M. Steblay, *A Meta-Analytic Review of the Weapon Focus Effect*, 16 Law & Hum. Behav. 413, 414 (1992) [hereinafter Steblay, *Weapon Focus*]; Gary Wells et al., *Eyewitness Evidence: Improving Its Probative Value*, 7 Psychol. Sci. Pub. Int. 45, 53 (2006).

6. *Expressions of witness confidence.* The lack of a connection between accuracy of identification and confidence expressed by an eyewitness is "one of the most consistent findings in memory research literature." Kevin Krug, *The Relationship Between Confidence and Accuracy: Current Thoughts of the Literature and a New Area of Research,*

3 Applied Psychol. Crim. Just. 7, 31 (2007). According to Gary Wells and his colleagues, a witness's "self-rated and overtly expressed confidence is largely irrelevant in determining the criminal-identification accuracy of an eyewitness." Wells, *Juror Perceptions*, 64 J. Applied Psychol. at 447. According to Wells, expression of confidence is reliable *only* under *pristine, nonsuggestive conditions.* John T. Wixted & Gary L. Wells, *The Relationship Between Eyewitness Confidence and Identification Accuracy: A New Synthesis,* 18 Psychol. Sci. Pub. Int. 10, 11 (2017); *see also* Loftus et al., *Civil and Criminal* §3-12, at 68–72; Neil Brewer & Gary L. Wells, *The Confidence–Accuracy Relationship in Eyewitness Identification: Effects of Lineup Instructions, Foil Similarity, and Target-Absent Base Rates*, 12 J. Experimental Psychol.: Applied 11, 11 (2006) (indicating spontaneous confidence at the time of identification not subject to suggestion may be meaningful but the same is probably not true for statements made in court); Steven M. Smith et al., *Postdictors of Eyewitness Errors: Can False Identifications Be Diagnosed?*, 85 J. Applied Psychol. 542, 548 (2000).

7. *Cross-racial identification.* In an important article, Sheri Lynn Johnson asserted that cross-racial identification is subject to a higher rate of error. Participants were 1.56 times more likely to falsely identify a novel other-race face when compared with performance on own-race faces. Sheri Lynn Johnson, *Cross-Racial Identification Errors in Criminal Cases,* 69 Cornell L. Rev. 934, 935–36 (1984). *Subsequent research confirms Johnson's approach.* For example, in a 2001 meta-analysis that spanned thirty-nine research articles and nearly five thousand participants, researchers determined that cross-racial identifications are 56% more likely to be erroneous than same-race identification. *See* Christian A. Meissner & John C. Brigham, *Thirty Years of Investigating the Own-Race*

*Bias in Memory for Faces: A Meta-Analytic Review,* 7 Psychol., Pub. Pol'y, & L. 3, 15, 21 (2001).

The effects of misidentification dovetail with the growing body of social science finding the effects of implicit bias in color or skin tone, and in Afrocentric facial features in sentencing and presumed guilt, among other insidious effects. *See generally* Mark W. Bennett, *The Implicit Racial Bias in Sentencing: The Next Frontier*, 126 Yale L.J.F. 391 (2017); Irene V. Blair et al., *The Automaticity of Race and Afrocentric Facial Features in Social Judgments*, 87 J. Personality & Soc. Psychol. 763 (2004); Irene V. Blair et al., *The Influence of Afrocentric Facial Features in Criminal Sentencing*, 15 Psychol. Sci. 674 (2004); Traci Burch, *Skin Color and the Criminal Justice System: Beyond Black-White Disparities in Sentencing*, 12 J. Empirical Legal Stud. 395 (2015); Travis L. Dixon & Keith B. Maddox, *Skin Tone, Crime News, and Social Reality Judgments: Priming the Stereotype of the Dark and Dangerous Black Criminal*, 35 J. Applied Soc. Psychol. 1555 (2005); Jennifer L. Eberhardt et al., *Looking Deathworthy: Perceived Stereotypicality of Black Defendants Predicts Capital-Sentencing Outcomes*, 17 Psychol. Sci. 383 (2006); Jennifer L. Eberhardt et al., *Seeing Black: Race, Crime, and Visual Processing*, 87 J. Personality & Soc. Psychol. 876 (2004); Ryan D. King & Brian D. Johnson, *A Punishing Look: Skin Tone and Afrocentric Features in the Halls of Justice*, 122 Am. J. Soc. 90 (2016); William T. Pizzi et al., *Discrimination in Sentencing on the Basis of Afrocentric Features*, 10 Mich. J. Race & L. 327 (2005); Jaclyn Ronquillo et al., *The Effects of Skin Tone on Race-Related Amygdala Activity: An fMRI Investigation*, 2 Soc. Cognitive Affective & Neuroscience 39 (2007).

8. *Bystander effect.* Research has demonstrated that a witness that is vaguely familiar with another may innocently but wrongly identify the person as the perpetrator of crime. *See* J.D. Read et al.*, The Unconscious*

*Transference Effect: Are Innocent Bystanders Ever Misidentified?*, 4 Applied Cognitive Psychol. 3, 26 (1990); David F. Ross et al., *Unconscious Transference and Mistaken Identity: When a Witness Misidentifies a Familiar but Innocent Person,* 79 J. Applied Psychol. 918, 918 (1994).

9. *Cowitness contamination.* Discussions with cowitnesses can contaminate memories and lead to misidentification of perpetrators. Elim M. Skagerberg, *Co-Witness Feedback in Line-Ups,* 21 Applied Cognitive Psychol. 489, 495 (2007) ("[T]he present findings show that in cases involving multiple witnesses, positive feedback about the identification and choice of suspect from a co-witness could lead to higher levels of certainty as compared to negative feedback. . . . [M]ean[ing] that a witness could be more willing to testify in court and could be more certain about the correctness of the identification simply due to confirming feedback from a naïve co-witness and *vice versa.*").

**D. System Variables.**

1. *Blind administration.* When an identification process is conducted, the research demonstrates that lineup administrators familiar with the suspect may leak that information "by consciously or unconsciously communicating to witnesses which lineup member is suspect." Sarah M. Greathouse & Margaret Bull Kovera, *Instruction Bias and Lineup Presentation Moderate the Effects of Administrator Knowledge on Eyewitness Identification,* 33 Law & Hum. Behav. 70, 71 (2009); *see also* Steven E. Clark et al., *Lineup Administrator Influences on Eyewitness Identification Decisions,* 15 J. Experimental Psychol.: Applied 63, 67–73 (2009); Ryann M. Haw & Ronald P. Fisher, *Effects of Administrator–Witness Contact on Eyewitness Identification Accuracy,* 89 Applied Psychol. 1106, 1107 (2004). The scholarship is in agreement: failure to conduct

administratively blind lineups increases the likelihood of a misidentification.

2. *Preidentification instructions.* The science consistently demonstrates that telling a witness in advance that a suspect may or may not be in a lineup enhances the reliability of an eyewitness identification. *See* Stephen E. Clark, *A Re-examination of the Effects of Biased Lineup Instructions in Eyewitness Identification,* 29 Law & Hum. Behav. 395, 396 (2005); Nancy M. Steblay, *Social Influence in Eyewitness Recall: A Meta-Analytic Review of Lineup Instruction Effects*, 21 Law & Hum. Behav. 283, 285–86, 294 (1997).

3. *Lineup construction.* Much has been written about the need to properly construct lineups or photo arrays. It is important that the suspect not stand out from the other fillers presented to the witness. *See* David F. Ross et al., *When Accurate and Inaccurate Eyewitnesses Look the Same: A Limitation of the 'Pop-Out' Effect and the 10- to 12-Second Rule,* 21 Applied Cognitive Psychol. 677, 687 (2007); Gary L. Wells & Amy Bradford, *Measuring the Goodness of Lineups: Parameter Estimation, Question Effects, and Limits to the Mock Witness Paradigm,* 13 Applied Cognitive Psychol. S27, S30 (1999).

4. *Feedback.* The research shows that where a witness receives positive feedback, the confidence level in the identification is artificially increased. Further, confirmatory feedback can lead witnesses to "significantly inflate their reports to suggest better witnessing conditions at the time of the crime, stronger memory at the time of the lineup, and sharper memory abilities in general." Amy Bradfield Douglass & Nancy Steblay, *Memory Distortion in Eyewitnesses: A Meta-Analysis of the Post-Identification Feedback Effect*, 20 Applied Cognitive Psychol. 859, 864–65 (2006); *see also* Jeffrey S. Neuschatz et al., *The Effects of Post-Identification*

*Feedback and Age on Retrospective Eyewitness Memory*, 19 Applied Cognitive Psychol. 435, 449 (2005); Gary L. Wells & Amy L. Bradford, *"Good, You Identified the Suspect": Feedback to Eyewitnesses Distorts Their Reports of the Witnessing Experience*, 83 J. Applied Psychol. 360, 374 (1998) [hereinafter Wells, *Good ID*].

5. *Multiple viewing.* The scientific literature finds multiple viewings of a suspect problematic. The problem has been called "mugshot exposure." To illustrate, one meta-analysis found that while 15% of eyewitnesses misidentified a suspect in a lineup, that figure increased to 37% if the witness had seen the innocent person in a prior mugshot. Kenneth A. Deffenbacher et al., *Mugshot Exposure Effects: Retroactive Interference, Mugshot Commitment, Source Confusion, and Unconscious Transference*, 30 Law & Hum. Behav. 287, 299 (2006).

6. *Showups.* Showups occur when a witness is given a photo of one person, or if a single person is presented to the witness for identification purposes. A showup, of course, is highly suggestive in that only one person is presented for identification and the witness may be confident that the person presented has not been selected at random. Showups, however, can be useful if a suspect is apprehended in close temporal proximity to the crime.

Yet, a showup is necessarily highly suggestive and cannot be blindly administered. Research shows that the ability of a witness to accurately identify a suspect decreases rapidly within two hours of the event. A. Daniel Yarmey et al., *Accuracy of Eyewitness Identifications in Showups and Lineups*, 20 Law & Hum. Behav. 459, 464 (1996) [hereinafter Yarmey, *Lineup Accuracy*]. According to the study, "after [two hours], a one-person lineup was four times as likely to lead to a false identification of the innocent suspect than if that same suspect was in a six-person lineup."

*Id.* at 465. Research shows that when an innocent suspect closely resembled a perpetrator, 23% identified the innocent person in a showup compared to 17% in a lineup. Nancy Steblay et al., *Eyewitness Accuracy Rates in Police Showup and Lineup Presentations: A Meta-Analytic Comparison,* 27 Law & Hum. Behav. 523, 533 (2003) [hereinafter Steblay, *Police Presentations*].

**E. Compound Risk of Misidentification When Multiple Factors Are Present.** *The risk of misidentification is compounded when multiple factors that impair accurate identification are present.* It is tempting to regard some of the above factors as some kind of arithmetic checklist. This would be a mistake. First, in a given case, any one of the above factors may be so overwhelming as to run an unacceptable risk of error. For example, a highly suggestive photo array where the defendant is obviously different from fillers cannot be cured by an eyewitness instruction and a double-blind administration of the process. Also, however, the various factors that affect eyewitness accuracy often interact to compound the risk of mistaken identification. *See* Kathy Pezdeck*, Content, Form, and Ethical Issues Concerning Expert Psychological Testimony on Eyewitness Identification, in Expert Testimony on the Psychology of Eyewitness Identification* 36-37 (Brian L. Cutler ed., 2009). When confidence is inflated, eyewitnesses tend to report that conditions of viewing the crime were better than they were and that they were more confident in their memory and their answers. Wells, *Good ID*, at 374. The negative effect of weapon focus on identification accuracy may be magnified when combined with stress, short exposure time, poor visibility conditions, or longer retention intervals. Steblay, *Weapon Focus,* 16 Law & Hum. Behav. at 417.

**F.  Impact of Contamination on Later Identifications.**  We are all familiar with the proverbial question, "[H]ow can you unring the bell?" Wells and Quinlivan explain that following a misidentification, the witness' original memory is overwritten by the memory of the misidentified suspect, making later identifications tainted by the earlier error.  Wells & Quinlivan, *Suggestive Procedures,* 33 Law & Hum. Behav. at 8–9.  Research tends to indicate that witnesses who have taken part in suggestive procedures are more likely to implicate an innocent subject in a later nonsuggestive lineup.  *See generally* Dan Simon, *In Doubt: The Psychology of the Criminal Justice Process* (2012); Bruce W. Behrman & Lance T. Vayder, *The Biasing Influence of a Police Showup: Does the Observation of a Single Suspect Taint Later Identification?,* 79 Perceptual & Motor Skills 1239 (1994).

**G.  Impact of Unreliable Eyewitness Identification on Jurors.**  Jurors tend to put great faith in eyewitness identifications. As noted by three leading eyewitness experts, jurors tend to have a "nearly religious faith in the accuracy of eyewitness accounts."  Loftus et al., *Civil and Criminal* § 12-1 at 274.  Two other experts have noted "jurors appear to regard eyewitness evidence as one of the most persuasive type of evidence that can be presented." John C. Brigham & Robert K. Bothwell, *The Ability of Prospective Jurors to Estimate the Accuracy of Eyewitness Identification*, 7 Law & Hum. Behav. 19, 19 (1983).  The experimental results are telling. In one illustrative study, mock jurors were presented with the same evidence except one set of jurors were told that there were no eyewitnesses, while the remainder were told that there was an eyewitness who identified the defendant.  The second set of jurors were told that the eyewitness was legally blind and was not wearing prescribed glasses when the incident occurred.  Among the first set of mock jurors, only 18% convicted the defendant, while among the second set, 68% returned a conviction.  *See*

Cindy J. O'Hagen, *When Seeing Is Not Believing: The Case for Eyewitness Expert Testimony,* 81 Geo. L.J. 741, 745 (1993).

In another experiment, mock jurors evaluated the accuracy of forty-two witnesses. Some of the witnesses made an accurate identification, while others did not. Some witnesses were examined using leading questions, while other witnesses were examined with nonleading questions. Where the witnesses were cross-examined with leading questions, only 27% of the mock juror were able to identify inaccurate eyewitnesses, while only 14% were able to identify inaccurate eyewitnesses after nonleading examination. The study suggests that even with effective cross-examination, jurors may believe three out of four mistaken identifications. George Vallas, *A Survey of Federal and State Standards for the Admission of Expert Testimony on the Reliability of Eyewitnesses*, 39 Am J. Crim. L. 97, 108–110 (2011).

Further, mounting evidence indicates that jurors continue to disregard variables that detract from eyewitness accuracy. *See* Tanja Rapus Benton et al., *Eyewitness Memory Is Still Not Common Sense: Comparing Jurors, Judges and Law Enforcement to Eyewitness Experts*, 20 Applied Cognitive Psychol. 115, 119–20 (2006). Jurors tend to evaluate eyewitnesses based upon three criteria: witness confidence, consistency of testimony, and memory of specific details. None of these criteria relate with identification accuracy. *See* Cutler & Penrod, *Mistaken ID* at 181–90, 200–03 (1995) (describing results of several studies regarding factors contributing to accuracy of identifications); *see also* Jennifer L. Devenport et al., *Eyewitness Identification Evidence: Evaluating Commonsense Evaluations*, 3 Psychol., Pub. Pol'y, & L. 338, 340–42 (1997); Henry F. Fradella, *Why Judges Should Admit Expert Testimony on the Unreliability of Eyewitness Testimony*, 2 Fed. Cts. L. Rev. 1, 28 (2006) ("The scientific

research on memory, generally, and eyewitness identification in particular 'are quite counterintuitive and hardly commonsensical.' "); Wells, *Juror Perceptions*, 64 J. Applied Psychol. at 446; Richard A. Wise et al., *A Tripartite Solution to Eyewitness Error*, 97 J. Crim. L. & Criminology 807, 812 (2007) ("[S]cientific research has revealed that eyewitness memory is much more malleable and susceptible to error than is generally realized.").

The effectiveness of cross-examination as a safeguard is questionable in light of the lack of juror sensitivity to factors that are known to be diagnostic of eyewitness reliability. Cutler & Penrod, *Mistaken ID*, at 197–209. Indeed, the history of the development of cross-examination shows that it was designed to detect perjury, or liars, who might no longer be affected by the oath required to give testimony. *See* Jules Epstein, *The Great Engine that Couldn't: Science, Mistaken Identifications, and the Limits of Cross-Examination*, 36 Stetson L. Rev. 727, 765–70 (2007) (tracing development of cross-examination to declining power of oath and risk of perjury). Certainly the ability to cross-examine had little impact in the DNA exoneration cases, where there is no reason to believe that any of the victims did not honestly believe they had accurately identified their attackers.

As noted by Gary Wells and his colleagues, "Cross-examination, a marvelous tool for helping jurors discriminate between witnesses who are intentionally deceptive and those who are truthful, is largely useless for detecting who are trying to be truthful but are genuinely mistaken." Wells, *Lineups and Photospreads*, 22 Law & Hum. Behav. at 609 (citation omitted). More colorfully, Elizabeth Loftus and her colleagues note that cross-examination of a sincere eyewitness is "akin to trying to land a very large energetic fish on a very light line." Loftus et al., *Civil and Criminal*, § 12-1[b], at 276. They caution that the likelihood that "the lawyer will not

be able to obliterate the eyewitness during cross-examination" does not "mean that the eyewitness cannot obliterate the lawyer." *Id.* § 12-8, at 284. They characterize cross-examination of a sincere eyewitness as generating thrills per moment equivalent to "walking through a mine field." *Id.* The mine field analogy is apt, as any lawyer who has attempted to cross-examine a sincere but mistaken witness can attest.

**H. The Severe Problem of Aggravated Suggestiveness: One Person Showups.** As noted more than fifty years ago by the United States Supreme Court, "[i]t is hard to imagine a situation more clearly conveying the suggestion to the witness that the one presented is believed guilty by the police" than a one person showup. *Wade*, 388 U.S. at 234, 87 S. Ct. at 1936; *see also* Richard Gonzales et al., *Response Biases in Lineups and Showups,* 64 J. Personality & Soc. Psychol. 525, 525 (1993); Gary Wells, *Police Lineups: Data, Theory, and Policy,* 7 Psychol., Pub. Pol'y, & L. 791, 795 (2001). In a meta-analysis, researchers have found that one person showups produce twice as many false identifications as fair lineups. Steblay, *Police Presentations*, 27 Law & Hum. Behav. at 530.

Research has further shown that the time disparity between the event and the identification process affects this disparity. When the gap is less than two hours, the disparity in accuracy is nonexistent. When the gap is twenty-four hours, showups are almost four times as likely to produce a misidentification with an error rate as high as 58%. Yarmey, *Lineup Accuracy*, 20 Law & Hum. Behav. at 465. Thus the combination of delay in the identification process and a one person showup produces a very high risk of misidentification. *See* Amy Luria, *Showup Identifications: A Comprehensive Overview of the Problems and a Discussion of Necessary Changes*, 86 Neb. L. Rev. 515, 516, 519–20 (2008).

In-court identifications, of course, are a highly suggestive form of one person showups. According to Gary Wells and Eric P. Seelau, "in-court identification is a mere formality, of course, and should not be given much credence, because it is usually obvious who is on trial." Gary L. Wells & Eric P. Seelau, *Eyewitness Identification: Psychological Research and Legal Policy on Lineups*, 1 Psychol., Pub. Pol'y, & L. 765, 766 (1995); *see also* Ralph Norman Haber & Lyn Haber, *Experiencing, Remembering and Reporting Events,* 6 Psychol., Pub. Pol'y, & L. 1057, 1082 (2000).

In some respects, an in-court identification is worse than the usual showup. In an in-court identification, the state has arrested and charged the defendant. His appearance in court does not simply suggest, but strongly announces in the solemnity of the courtroom, that the state believes the defendant is guilty. *See* Jules Epstein, *Irreparable Misidentifications and Reliability: Reassessing the Threshold for Admissibility of Eyewitness Identification*, 58 Vill. L. Rev. 69, 69–70 (2013); Aliza B. Kaplan & Janis C. Puracal, *Who Could It Be Now: Challenging the Reliability of First Time in-Court Identifications After* State v. Henderson *and* State v. Lawson, 105 J. Crim. L. & Criminology 947, 954 (2015); Dana Walsh, *The Dangers of Eyewitness Identification: A Call for Greater State Involvement to Ensure Fundamental Fairness*, 36 B.C. Int'l & Comp. L. Rev. 1415, 1416–17 (2013).

As noted by Loftus and her colleagues, a first-time, in-court identification is not more reliable, but it is more compelling. Loftus et al., *Civil and Criminal* § 8.17(e), at 182–83. That spells real trouble for those concerned with accurate verdicts.

**I. Consensus in the Eyewitness Identification Scholarly Community.** The mere fact that an isolated study or two come to a certain conclusion is ordinarily not enough to move the law. Certainly the law

responds to science, but it moves slowly. But move it does. When a scholarly consensus emerges on basic scientific principles, however, the law must adapt to avoid mindless perpetuation of irrational and arbitrary processes.

Here, there is clearly a scholarly consensus. Based on the evidence before a special master, the New Jersey Supreme Court agreed with one of the experts who testified that eyewitness research represents the "gold standard in terms of the applicability of social science research to the law." *Henderson*, 27 A.2d at 916. As noted in *Henderson,*

> Experimental methods and findings have been tested and retested, subjected to scientific scrutiny through peer-reviewed journals, evaluated through the lens of meta-analyses, and replicated at times in real-world settings. As reflected above, consensus exists among the experts who testified on remand and within the broader research community.

*Id.* The state of the eyewitness science was described in the amicus brief filed by the American Psychological Association in *Perry.* According to the APA, "[e]yewitness science is widely accepted within the scientific community, and its key findings are largely uncontroversial." APA Amicus at *9 n.5.

**J. Summary.** The above factors should inform the analysis of whether an eyewitness identification runs an unacceptable risk of being unreliable. They offer an opportunity to introduce science into the analysis of reliability. It must be emphasized, however, that the factors are not checklist-type midterm exam where scoring 70% amounts to a passing grade. Any one of the factors might overwhelm the other factors in a given case. For example, a highly suggestive photo array could spoil what might otherwise have been a perfect identification procedure. Conversely, an

identification process using an excellent photo array may be undermined by suggestive comments by officers.

**V. The Development of the Nonscience Based Approach of the United States Supreme Court.**

**A. The *Wade*, *Gilbert*, and *Stovall* Trilogy: Promising but Ambiguous Beginnings.**

1. *Introduction.* The United States Supreme Court considered the admissibility of eyewitness testimony in three cases in the late 1960s: *Wade*, 388 U.S. 218, 87 S. Ct. 1926, *Gilbert v. California*, 388 U.S. 263, 87 S. Ct. 1951 (1967), and *Stovall v. Denno*, 388 U.S. 293, 87 S. Ct. 1967 (1967), *abrogated on other grounds by United States v. Johnson*, 457 U.S. 537, 102 S. Ct. 2579 (1982). In these cases, the United States Supreme Court demonstrated sensitivity and awareness of the possibility of misidentification through suggestive identification procedures.

2. Wade *and* Gilbert. In *Wade*, the Supreme Court considered an eyewitness identification made at a postindictment without notice to, and in the absence of, the defendant's counsel. *Id.* at 219–20, 87 S. Ct. at 1928. The *Wade* Court held that a defendant has a right to counsel at any stage of the prosecution where the absence of counsel might affect the accused's right to a fair trial. *Id.* at 227–28, 87 S. Ct. at 1932–33.[10]

The *Wade* Court concluded that a lineup was a critical stage where counsel was needed, noting that "identification evidence is peculiarly riddled with innumerable dangers and variable factors which might seriously, even crucially, derogate from a fair trial." *Id.* at 228, 87 S. Ct. at 1933. Further, the *Wade* Court stated that the suggestive nature of the government's identification process was "[a] major factor contributing to

---

[10]The right to counsel holdings in *Wade* and *Gilbert* were later eviscerated in *Kirby v. Illinois*, 406 U.S. 682, 690, 92 S. Ct. 1877, 1882–83 (1972).

the high incidence of miscarriage of justice from mistaken identification." *Id.* The *Wade* Court also noted that "the dangers for the suspect are particularly grave when the witness' opportunity for observation was insubstantial, and thus his susceptibility to suggestion the greatest." *Id.* at 229, 87 S. Ct. at 1933.[11]

In *Wade*, however, although the lineup involved was highly suggestive, the question was whether an in-court identification could be admitted notwithstanding the highly suggestive pretrial identification. *Id.* at 239–40, 87 S. Ct. at 1939. The *Wade* Court concluded that the state should be given the opportunity to show by clear and convincing evidence that the in-court identifications were based upon observations of the suspect independent of the lineup. *Id.* at 240, 87 S. Ct. at 1939. The *Wade* Court did not elaborate on the manner in which the district court was to determine whether the in-court identification could be considered independent of the prior identification.

In an interesting dissent, Justice White, joined by Justices Harlan and Stewart, criticized the majority for its prophylactic per se rule that the absence of counsel invalidated the pretrial identification. *Id.* at 251–52, 87 S. Ct. 1944–45. Justice White, however, showed an empirical bent,

---

[11]The *Wade* Court cited to a number of identification procedures in caselaw that were strikingly suggestive:

> [F]or example, that all in the lineup but the suspect were known to the identifying witness, that the other participants in a lineup were grossly dissimilar in appearance to the suspect, that only the suspect was required to wear distinctive clothing which the culprit allegedly wore, that the witness is told by the police that they have caught the culprit after which the defendant is brought before the witness alone or is viewed in jail, that the suspect is pointed out before or during a lineup, and that the participants in the lineup are asked to try on an article of clothing which fits only the suspect.

*Id.* at 233, 87 S. Ct. at 1935–36 (footnotes omitted).

stating that he would certainly bow to solid facts about how police conduct interrogations in the future. *Id.*

A similar result occurred in *Gilbert,* 388 U.S. 263, 87 S. Ct. 1951. There, the eyewitnesses identified the defendant in a postindictment lineup held in an auditorium attended by upwards of one hundred persons. *Id.* at 269–70, 87 S. Ct. at 1955. Defense counsel was not present at the identifications and the identifications were subject to a per se exclusionary rule. *Id.* at 271, 273, 87 S. Ct. at 1955–57. The state in this case was

> not entitled to an opportunity to show that that testimony had an independent source. Only a per se exclusionary rule as to such testimony can be an effective sanction to assure that law enforcement authorities will respect the accused's constitutional right to the presence of his counsel at the critical lineup. . . . [T]he desirability of deterring the constitutionally objectionable practice must prevail over the undesirability of excluding relevant evidence.

*Id.* at 273, 87 S. Ct. at 1957.

3. Stovall. The last case in the first eyewitness trilogy is *Stovall,* 388 U.S. 293, 87 S. Ct. 1967. In *Stovall,* the defendant was arrested in connection with a knife attack on a husband and wife, causing the husband's death and seriously wounding the wife who required hospitalization for life-saving surgery. *Id.* at 295, 87 S. Ct. 1969. The defendant was brought to the wife's hospital room, handcuffed to one of five police officers. *Id.* The defendant was the only African-American in the room. *Id.* After the defendant repeated a few words at the direction of a police officer for voice identification, the victim identified him as the assailant. *Id.* At trial, evidence was admitted related to the hospital room identification, and in addition, the victim subsequently made an in-court identification. *Id.* The defendant was convicted and sentenced to death.

*Id.* Stovall sought to collaterally attack his conviction in federal court. *Id.* at 295–96, 87 S. Ct. 1969.

The *Stovall* Court first determined that the right-to-counsel holdings of *Wade* and *Gilbert* were not retroactive and, as a result, Stovall was not entitled to the benefit of these right-to-counsel rulings. *Id.* at 296–301, 87 S. Ct. 1969–72. The *Stovall* Court's decision turned on a different argument, namely, that the eyewitness identification "was so unnecessarily suggestive and conducive to irreparable mistaken identification that [the admission of the identification] denied [the defendant] due process of law." *Id.* at 301–02, 87 S. Ct. at 1972. The *Stovall* Court emphasized that the due process "is a recognized ground of attack upon a conviction independent of any right to counsel claim" developed in *Wade* and *Gilbert*. *Id.* at 302, 87 S. Ct. at 1972.

The Supreme Court also noted briefly that "[t]he practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." *Id.* Yet, the *Stovall* Court declared that "a claimed violation of due process of law in the conduct of a confrontation [eyewitness identification] depends on the totality of the circumstances surrounding it." *Id.* The *Stovall* Court concluded that under the totality of circumstances, the presentation of the suspect to the hospitalized witness was imperative and, in light of her medical condition, "the usual police station line-up, which Stovall now argues he should have had, was out of the question." *Id.* at 302, 87 S. Ct. at 1972–73. In short, although one person showups are highly disfavored, the state can overcome such shortcomings by making a persuasive showing of necessity.

4. *Summary.* Two observations arise from the *Wade/Gilbert/Stovall* line of cases. First, *Wade* and *Gilbert* demonstrate that per se prophylactic

rules may be required to preserve the integrity of the underlying court processes. Second, independent of the right to counsel, a defendant may challenge unnecessarily suggestive identification processes that are conducive to irreparable mistaken identification and seek exclusion of the evidence from trial, on due process grounds. Third, in these cases, the Supreme Court showed considerable sensitivity to the problem of eyewitness misidentification.

**B.** *Simmons, Foster,* **and** *Coleman*: **Development of Barriers to Due Process Relief.**

1. *Introduction.* In the immediate years following the *Wade/Gilbert/Stovall* line of cases, the Supreme Court addressed eyewitness identification in *Simmons v. United States,* 390 U.S. 377, 88 S. Ct. 967 (1968), *Foster v. California,* 394 U.S. 440, 89 S. Ct. 1127 (1969), and *Coleman v. Alabama,* 399 U.S. 1, 90 S. Ct. 1999 (1970). In general, while retaining a theory of due process challenge to eyewitness testimony, the majority made it more difficult to prove a due process challenge by grafting onto the previous caselaw an additional multifactor requirement of reliability.

2. Simmons. In *Simmons,* a defendant was charged with armed robbery of a savings and loan association. 390 U.S. at 379, 88 S. Ct. at 969. Five employees of the savings and loan identified the defendant the morning after the robbery from a photograph of the suspects obtained from another suspect's family member. *Id.* at 380, 88 S. Ct. at 969. At trial, the state relied upon in-court identification of the five witnesses. *Id.* at 381, 88 S. Ct. at 970. *Simmons* claimed that the pretrial identification procedure was so unduly prejudicial as to fatally taint his conviction. *Id.*

The *Simmons* Court recognized that there was some danger that eyewitness misidentifications may arise even with the most correct

photographic identification procedures. *Id.* at 383–84, 88 S. Ct. at 971. *Simmons* further recognized that improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals. *Id.* On the other hand, the *Simmons* Court observed that eyewitness identifications had been used widely and effectively to apprehend offenders and to "spar[e] innocent suspects the ignominy of arrest." *Id.* at 384, 88 S. Ct. at 971. The danger of the use of eyewitness identification, according to the *Simmons* Court "may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error." *Id.*

The *Simmon*s Court rejected a rule-based approach to eyewitness identification and instead noted that each case must be considered on its own facts. *Id.* The *Simmons* Court declared that "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside . . . only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Id.*

Examining the facts, the *Simmons* Court concluded that the defendant was not entitled to relief. *Id.* The *Simmons* Court noted that the defendant did not suggest that the photographic identification was "unnecessary" in light of the interest to swiftly find the offenders. *Id.* at 384–85, 88 S. Ct. at 971. Further, the *Simmons* Court noted that there was little chance of a misidentification, observing among other things that the robbery took place in the afternoon in a well-lit bank, the robbers wore no masks, five bank employees viewed the robbers for up to five minutes, the identifications were made only a day later, all five bank employees separately identified Simmons as one of the robbers, and none of the witnesses expressed any doubt about the identifications. *Id.* at 385, 88

S. Ct. at 971–72. As a result, according to the *Simmons* Court, there was "little room for doubt that the identification of Simmons was correct, even though the identification procedure employed may have in some respects fallen short of the ideal." *Id.* at 385–86, 88 S. Ct. at 972.

In *Simmons*, Justice Black concurred in part and dissented in part. *Id.* at 395–99, 88 S. Ct. at 977–79 (Black, J. concurring in part and dissenting in part). He took the view that the reliability of eyewitness testimony was a matter for the jury and not subject to due process attack. *Id.* at 395–96, 88 S. Ct. at 977. He characterized this theory, later advanced by the defendant in *Coleman*, 399 U.S. 1, 90 S. Ct. 1999, as "frivolous." *Id.* at 395, 88 S. Ct. at 977. No other member of the Court joined his opinion.

3. Foster. The Supreme Court then considered a challenge to a suggestive police lineup in *Foster*, 394 U.S. 440, 89 S. Ct. 1127. In *Foster*, the defendant was charged with armed robbery of a Western Union office. *Id.* at 441, 89 S. Ct. at 1127. The only eyewitness to the crime was asked to make an identification from a lineup consisting of three men. *Id.* at 441, 89 S. Ct. at 1128. The defendant was around six feet tall, while the other men were around half-a-foot shorter than the defendant. *Id.* The defendant also wore a letter jacket, which the eyewitness said was similar to one seen underneath the coveralls of the robber. *Id.* The eyewitness could not positively identify the defendant, though he " 'thought' he was the man." *Id.* After the defendant was brought into the room to speak to the eyewitness, no positive identification resulted. *Id.* A week or ten days later, a second lineup of five men occurred where defendant was the only person who had been in the first lineup. *Id.* at 441–42, 89 S. Ct. at 1128. This time, the eyewitness was "convinced" the defendant was the robber. *Id.* at 442, 89 S. Ct. at 1128.

Applying the test articulated in *Simmons*, the *Foster* Court held that the identification procedure in this case "presents a compelling example of unfair lineup procedures." *Id.* The *Foster* Court noted that the eyewitness was presented with three opportunities to identify the defendant: a highly suggestive three man lineup where defendant was made distinctive by his height and attire, a one-on-one confrontation that was the equivalent of a one man showup, and then a second five man lineup where the defendant was the only person who also participated in the first lineup. *Id.* at 442–43, 89 S. Ct. at 1128–29. The *Foster* Court stated that "[i]n effect, the police repeatedly said to the witness, 'This is the man.' " *Id.* at 443, 89 S. Ct. at 1129. The identification procedure employed "so undermined the reliability of the eyewitness identification as to violate due process." *Id.* As a result, the Court reversed the case and remanded it for consideration as to whether any error was harmless. *Id.* at 443–44, 89 S. Ct. at 1129.

Justice Black again expressed in a solo dissent the view that the reliability of an eyewitness identification procedure was solely a question for the jury. *Id.* at 444–53, 89 S. Ct. at 1129–34 (Black, J. dissenting).

4. Coleman. Finally, in *Coleman*, 399 U.S. 1, 90 S. Ct. 1999, two defendants, convicted of assault with intent to murder, challenged their convictions based in part upon a station-house lineup they contend was "so unduly prejudicial and conducive to irreparable misidentification as [to] fatally . . . taint [the] in-court identifications of them" by the victim. *Id.* at 3, 90 S. Ct. at 2000. After the crime, the victim was only able to give a vague description that the perpetrators were young African-American males of similar age and height. *Id.* at 4, 90 S. Ct. at 2001. Yet, at a lineup two months after the incident, the victim claimed to have immediately identified Coleman in the lineup. *Id.* at 5, 90 S. Ct. at 2001. The victim subsequently made an in-court identification. *Id.*

On the record before it, the *Coleman* Court held that it could not find "that the trial court erred in finding that [the victim's] in-court identification of the [defendants] did not stem from an identification procedure at the lineup 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *Id.* The *Coleman* Court could have found that the identification was based upon observations at the time of the assault and was not prejudiced by the lineup, but they deigned to do so. *Id.* at 5–6, 90 S. Ct. at 2001. Further, the *Coleman* Court noted that because the victim immediately identified the defendant without any prompting or suggestion, any factual dispute regarding whether the defendant was the only one required to speak did not aid or influence the identification. *Id.* at 6, 90 S. Ct. at 2001–02. The *Coleman* Court further found the fact that the defendant was the only one in the lineup to wear a hat was insufficient to show that he was unfairly singled out, as the police did not require the hat to be worn and the witness later asked that it be removed to allow a better view of the suspect's face. *Id.* at 6, 90 S. Ct. at 2002.

5. *Summary. Wade, Gilbert,* and *Stovall* were brief opinions setting forth the bare structure of a potential due process claim arising out of eyewitness identification. These opinions contained opaque but robust language. *Simmons* in particular seems to represent a retreat, particularly from the potential reach of *Stovall,* when it added a new requirement that, to give rise to a due process claim, the identification procedure must under "the totality of surrounding circumstances" be "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons,* 390 U.S. at 383, 384, 88 S. Ct. at 970, 971. Whether the change in language from "unnecessarily suggestive" to

"impermissibly suggestive" was designed to be substantive is not clear from the opinion.

Yet, *Foster* demonstrated that the due process doctrine was not completely hollow, at least in a case where the eyewitness failed to identify the defendant, participated in a suggestive lineup that did not yield an identification, provided a showup yielding only a tentative identification, and then participated in another lineup where the eyewitness finally made a definite identification. *Foster*, 394 U.S. at 442–43, 89 S. Ct. at 1128–29. Further, *Foster* squarely stands for the proposition that a remedy for a constitutionally flawed identification potentially may be exclusion of evidence. *Id.* at 443, 89 S. Ct. at 1129.

Finally, in all three cases, *Simmons*, *Foster*, and *Coleman* were three turns on the screw establishing "a very substantial likelihood of irreparable misidentification" as the focus of reliability analysis. In its development of its due process framework and its analysis of reliability, the Supreme Court was unaided by the large body of eyewitness science that would become available decades later.

**C.** *Biggers* **and** *Manson*: **The Emergence of Seat-of-the-Pants Constitutional Criteria.**

1. *Introduction.* The United States Supreme Court returned to the question of the admission of eyewitness testimony in *Biggers*, 409 U.S. 188, 93 S. Ct. 375, and *Manson v. Brathwaite*, 432 U.S. 98, 97 S. Ct. 2243 (1977). Like their predecessors, these forty-year-old cases predate the explosion in eyewitness science which occurred largely in later years. Nonetheless, *Biggers* and *Manson* form the basis of current federal constitutional law on the due process challenges to eyewitness identification.

2. Biggers. In *Biggers*, a defendant convicted of rape challenged an eyewitness identification on due process grounds. *Biggers*, 409 U.S. at 189–90, 93 S. Ct. at 377–78. In this case, the victim alleged the defendant grabbed her from behind and threw her down on the floor in a kitchen that had no light, though the victim claimed that at one point during the attack sufficient light shined through from the bedroom to see the defendant's face. *Id.* at 193–94, 93 S. Ct. at 379. When the victim's screams alerted the victim's daughter to the attack, the daughter also screamed, and the assailant demanded that the victim tell her to shut up or both would be killed. *Id.* at 194, 93 S. Ct. at 379. The assailant forced the victim outside and into the woods at knifepoint, under a full moon, and raped her. *Id.* The attack took approximately fifteen to thirty minutes. *Id.*

The victim testified in the criminal prosecution that she provided police with "a very general description" of the assailant as "being fat and flabby with smooth skin, bushy hair and a youthful voice." *Id.* at 194, 93 S. Ct. at 380. At the federal habeas hearing, she further testified that she "described her assailant as being between 16 and 18 years old and between five feet ten inches and six feet, tall, as weighing between 180 and 200 pounds, and as having a dark brown complexion." *Id.*

The victim was shown between thirty and forty photographs, finding only one individual with similar features to her assailant, but did not make an identification. *Id.* at 195, 93 S. Ct. at 380. When police arrested the individual with similar features on other charges, they asked the victim to come to the police station. *Id.* Police could not find additional stand-ins with similar features for a lineup, and elected to do a one person showup instead. *Id.* The suspect, accompanied by officers, was marched past the victim and instructed to say "shut up or I'll kill you." *Id.* The victim made an identification from the showup. *Id.*

In considering the due process issue, the *Biggers* Court canvassed prior cases, and emphasized that "the primary evil to be avoided is 'a very substantial likelihood of irreparable misidentification.'" *Id.* at 198, 93 S. Ct. at 381 (quoting *Simmons*, 390 U.S. at 384, 88 S. Ct. at 971). The Supreme Court doubled down, noting that "[i]t is the likelihood of misidentification which violates a defendant's right to due process, and it is this which was the basis of the exclusion of evidence in *Foster*." *Id.* at 198, 93 S. Ct. at 381–82.

The *Biggers* Court addressed the question of whether unnecessary suggestiveness in an identification procedure alone was sufficient to give rise to a due process violation, stating that a "strict rule" to that effect would "deter the police from using a less reliable procedure where a more reliable one may be available." *Id.* at 199, 93 S. Ct. at 382. However, the Court moved on to "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Id.* In order to make that determination, the *Biggers* Court stated that

> the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Id.* at 199–200, 93 S. Ct. at 382. There was no indication at all of where these five factors came from, but they were simply declared *ipse dixit*.

Applying these factors of unexplained origin, the *Biggers* Court determined that there was no substantial likelihood of misidentification in this case. *Id.* at 200, 93 S. Ct. at 382. In making this determination, the Court noted the victim was attacked up to thirty minutes by the

perpetrator under adequate artificial light in her house and under a full moon outdoors, and on two occasions faced him directly and intimately. *Id.* The Court emphasized that the eyewitness "was no casual observer, but rather the victim of one of the most personally humiliating of all crimes." *Id.* at 200, 93 S. Ct. at 382–83. Her contemporaneous description of the assailant to the police "might not have satisfied Proust but was more than ordinarily thorough," noting that the victim was "a practical nurse by profession, [and] had an unusual opportunity to observe and identify her assailant." *Id.* at 200–01, 93 S. Ct. at 383. Further, the victim testified the defendant had a face "I don't think I could ever forget." *Id.* at 201, 93 S. Ct. at 383.

The Court did recognize that "a lapse of seven months between the rape and the confrontation . . . would be a seriously negative factor in most cases," but, also noted that the witness had not made a prior identification and resisted earlier suggestive procedures. *Id.* As a result, weighing all the factors, the Court concluded that there was "no substantial likelihood of misidentification." *Id.*

Justice Brennan, joined by Justices Douglas and Stewart, concurred in part and dissented in part. *Id.* at 201–04, 93 S. Ct. at 384 (Brennan, J., concurring in part and dissenting in part). Justice Brennan did not directly attack the *Biggers* factors but instead challenged their application in the case, emphasizing that the district court and the court of appeals concluded under all the facts and circumstances that there existed an "intolerable risk of misidentification." *Id.* at 202, 93 S. Ct. at 384. Justice Brennan concluded that the Court should honor the lower court determinations in this case. *Id.* at 203–04, 93 S. Ct. at 384.

3. Manson. In 1977, the Supreme Court considered another challenge to eyewitness identification in *Manson,* 432 U.S. 98, 97 S. Ct.

2243. In *Manson,* undercover officers engaged in a drug transaction at the door of a third floor apartment. *Id.* at 99–100, 97 S. Ct. at 2245–46. One of the officers knocked on the door, which opened twelve to eighteen inches, and observed a man standing at the door. *Id.* at 100, 97 S. Ct. at 2246. The undercover officer gave the man money, the door closed, and soon thereafter the man opened the door and gave the undercover officer two glassine bags. *Id.* The area was illuminated by a window in the third floor hallway, and the entire transaction took approximately five to seven minutes. *Id.* at 100–01, 97 S. Ct. at 2246.

After the transaction, the undercover officer described the man to other police officers in some detail. *Id.* at 101, 97 S. Ct. at 2246. From the description, one of the other officers suspected that the defendant may have been the person selling the drugs and left the photograph at the office of the undercover officer. *Id.* When the undercover officer returned to the office, he identified the person in the photo as the person from whom he had purchased drugs. *Id.* The photo of the defendant was admitted into evidence at trial without objection, and the undercover officer also made an in-court identification without objection. *Id.* at 102, 97 S. Ct. at 2247 "No explanation was offered by the prosecution for the failure to utilize a photographic array or to conduct a lineup." *Id.* at 102, 97 S. Ct. at 2247.

On appeal for a petition for habeas corpus, the United States Court of Appeals for the Second Circuit concluded that the use of the photograph was suggestive and unnecessary. *Id.* at 103–04, 97 S. Ct. at 2247. Indeed, Thus, the question avoided in *Biggers* was posed: Is a post-*Stovall* showup that is unnecessary subject to a per se rule of exclusion? *Id.* at 107, 97 S. Ct. at 2249.

The *Manson* Court considered factors weighing in favor and against exclusion, distinguishing between two possible approaches: one that

focused on the suggestive procedure and the other, more lenient approach, that focused on the totality of the circumstances. *Id.* at 110–11, 97 S. Ct. at 2250–51. The *Manson* Court cited an opinion by then-Judge John Paul Stevens, noting, "There is surprising unanimity among scholars in regarding such a rule [the per se approach] as essential to avoid serious risk of miscarriage of justice." *Id.* at 111, 97 S. Ct. at 2251 (alteration in original) (quoting *United States ex rel. Kirby v. Sturges*, 510 F.2d 397, 405 (7th Cir. 1975)). The *Manson* Court acknowledged the defendant's argument that a totality rule does not provide adequate deterrence, that identification evidence is so convincing to the jury that sweeping exclusionary rules are required, and that the fairness of the trial is threatened by a suggestive confrontation. *Id.* at 111, 97 S. Ct. at 2251.

While recognizing arguments to the contrary, the *Manson* Court rejected the per se approach for three reasons. First, the *Manson* Court stated that the per se rule swept too far would keep evidence from the jury that is reliable and relevant. *Id.* at 112, 97 S. Ct. at 2252. Second, the *Manson* Court found that while the per se approach has the more significant deterrent effect, the totality approach also has an influence on police behavior. *Id.* Finally, the *Manson* Court cited concerns that the administration of justice may be impeded by the denial of admission of reliable evidence. *Id.* at 112–13, 97 S. Ct. at 2251. As a result of these three factors, the *Manson* Court declared that "reliability is the linchpin in determining the admissibility of identification testimony for both pre- and post-*Stovall* confrontations." *Id.* at 114, 97 S. Ct. at 2253. Applying the five *Biggers* factors, the Court concluded that the eyewitness evidence, though the product of a suggestive showup, was nevertheless sufficiently reliable to go to the jury. *Id.* at 117, 97 S. Ct. at 2254.

Justice Marshall, joined by Justice Brennan, dissented. *Id.* at 118–36, 97 S. Ct. at 2255–64 (Marshall, J. dissenting). Justice Marshall emphasized that the language in *Wade* noting the "high incidence of miscarriage of justice" applied in this case as well. *Id.* at 119, 97 S. Ct. at 2255 (quoting *Wade,* 388 U.S. at 228, 87 S. Ct. at 1933). He urged a return to the principle in *Stovall* that unnecessarily suggestive identification should be subject to per se exclusion. *Id.* at 128, 97 S. Ct. at 2260. In the alternative, Justice Marshall reviewed the facts of the case in light of the five *Biggers* factors, concluding that under application in this case, there was a serious risk of irreparable misidentification. *Id.* at 135–36, 97 S. Ct. at 2264.

4. *Summary. Biggers* and *Manson* plainly retreat from enforcement of a per se exclusionary rule as suggested in *Stovall* in favor of an ad hoc, case-by-case analysis of eyewitness identification under the unique facts of each case for both lineups and showups. This difference between a more stringent per se approach and an ad hoc multifactored approach was based upon different perceptions of the depth of the problem by members of the Court. Clearly, Justices Marshall and Brennan stressed the injustice of conviction based on mistaken but highly persuasive eyewitness identifications, while the more conservative members of the Court seemed most concerned with upholding verdicts and conserving judicial resources.

The dissents in *Bigger*s and *Manson* also demonstrate how conscientious judges can come to different conclusions on the ad hoc judgment required for flawed lineups. The pliable multifactored test is sufficiently flexible to allow admission of most suggestive eyewitness identification. *See* David E. Paseltiner, *Twenty-Years of Diminishing Protection: A Proposal to Return to the* Wade *Trilogy's Standards,* 15 Hofstra

L. Rev. 583, 606 (1987) [hereinafter Paseltiner, *Diminishing Protection*].  Put simply, *Biggers* and *Manson* were not informed by science.[12]

**E.  Analysis of *Biggers* Factors in Light of Modern Eyewitness Science.**

1. *Introduction.*  The five-factor *Biggers* test developed forty years ago is now largely discredited in light of the accumulated eyewitness science.  At the outset, the results of social science and DNA exonerations have highlighted the depth of the problem.  Obtaining accurate, reliable eyewitness identification is not a one-off issue in an occasional case, but is widespread throughout our criminal justice system.  Thus, the dimension of the problem of eyewitness identification is more consistent with *Stovall* and the dissenting opinions of Justices Marshall and Brennan than with the majority view in *Biggers* and *Manson.*

In addition, there are four avenues of criticism for the *Biggers* factors.  First, some of the five identified factors themselves are simply inaccurate indicators of the reliability of eyewitness identifications.  Second, three of the five factors for judging reliability are not independent of a suggestive underlying identification.  In other words, the more suggestive the underlying identification, the greater the likelihood of an eyewitness confirming the accuracy of identification through the *Biggers* factors.  Third, the five factors do not consider potent additional factors that can dramatically impact reliability.  Finally, as a multifactored test, the *Biggers* test fails to produce consistent results and may too often be applied in an outcome oriented manner.  Cumulatively, the validity of the

---

[12]In the 1970s, only four published articles appeared in the psychological literature containing the words "eyewitness" and "identify" in their abstract.  *Henderson*, 27 A.3d at 892.

*Biggers* test has been washed away by the overwhelming flood of eyewitness science.

2. *Inaccurate factors: consistency and confidence.* With respect to inaccuracy, two of the five *Biggers* factors are flawed. First, the notion that consistency of the identification with a previous description is an element of reliability is circular. It may simply show that the eyewitness is consistently erroneous. As noted by Wells and Quinlivan, the consistency thus may show accuracy with the person identified by the eyewitness, but may not be accurate in connection with the real culprit. Wells & Quinlivan, *Suggestive Procedures*, 33 Law & Hum. Behav. at 12–13.

Second, as noted above, the certainty factor in *Biggers* is not meaningfully related to accuracy. The eyewitness science on this issue has been canvassed earlier in this opinion and need not be repeated. By way of summary, confirmatory statements from lineup administrators consistently inflate eyewitness certainly for eyewitnesses who are, in fact, mistaken. *Id.* A spontaneous exclamation of certainty in a nonsuggestive setting may have some value but only if such expression arises in a pristine, nonsuggestive setting. *Id.*

3. *Bitter irony: The more suggestive the identification, the more likely it satisfies* Biggers *criteria.* In addition, the literature notes that the suggestive factors of an identification bleed into and affect the reliability factors. The first three *Biggers* criteria of view, attention, and certainty, are retrospective self-reports that ask a witness to report on their own credibility. As noted in the discussion of eyewitness science presented earlier, these self-reports are influenced by the suggestiveness of the underlying identification procedure. Thus, a suggestive procedure drives up the view, attention, and certainty criteria of reliability. This

interrelationship produces a huge irony: the more suggestive the procedure, the greater the likelihood of reliability. *Id.* at 16–17. Rather than its intended purpose of deterrence, the *Biggers* test encourages suggestive procedures that artificially inflate witness self-reporting of reliability factors.

4. *Incomplete character of* Biggers *factors.* As should be apparent from the above discussion, the B*iggers* factors are woefully incomplete. They do not include a wide selection of estimator and system variables. *Id.* at 21. As the preceding discussion of eyewitness science demonstrates, the list of excluded items is extensive.

5. *Outcome oriented application.* Finally, the indefinite character of the five factor *Biggers* test invites outcome oriented applications. *Id.* at 18. There is no clear indication of where to draw the line, and thus there is a tendency to draw no line at all. And, as *Biggers* and *Manson* demonstrated, the five factors are quite malleable and produce different results for different judges. But under the *Biggers* approach, the condemned showup has flourished because the malleable *Biggers* standards have not provided a barrier to admission of suggestive identifications.[13] Accordingly, "even intentional or flagrant suggestive conduct might produce no negative consequences for the police under the totality of circumstances approach." Steven P. Grossman, *Suggestive Identifications: The Supreme Court's Due Process Test Fails to Meet Its Own Criteria*, 11 U. Balt. L. Rev. 53, 59 (1981); *see* Brandon L. Garrett, *Eyewitnesses and Exclusion*, 65 Vand. L. Rev. 449, 451–52 (2012) (arguing

---

[13]The tendency of courts to admit identifications arising from unnecessarily suggestive procedures is strong. According to one study, post-*Biggers* federal courts upheld admissibility challenges of eyewitness testimony produced by suggestive identification procedures in nine times out of ten. Nicholas A. Kahn-Fogel, *Manson and Its Progeny: An Empirical Analysis of American Eyewitness Law*, 3 Ala. C.R. & C.L. L. Rev. 175, 209–10 (2012).

that the *Biggers* test is fundamentally flawed and weighted toward inclusion of inherently unreliable evidence).

6. *Summary.* Both legal scholars and psychological experts decry the *Biggers* test. The scholarly legal opinion is unanimously critical. *See, e.g.*, Nicholas A. Kahn-Fogel, *Manson and Its Progeny: An Empirical Analysis of American Eyewitness Law*, 3 Ala. C.R. & C.L. L. Rev. 175, 191–96 (2012) [hereinafter Kahn-Fogel, *Manson Empirical Analysis*] (citing "unanimous opposition" among legal scholars to the Supreme Court approach in *Manson*); Margery Malkin Koosed, *Reforming Eyewitness Identification Law and Practice to Protect the Innocent*, 42 Creighton L. Rev. 595, 601 (2009) (urging action to reverse the current trend "to tolerate eyewitness identification procedures that gratuitously increase the risk of convicting innocent persons"); Timothy P. O'Toole & Giovanna Shay, Manson v. Brathwaite *Revisited: Towards a New Rule of Decision for Due Process Challenges to Eyewitness Identification Procedures*, 41 Val. U. L. Rev. 109, 121 (2006) [hereinafter O'Toole, *Due Process Challenges*] (characterizing the problems with *Manson* as "fairly obvious in light of the psychological research"); Paseltiner, *Diminishing Protection*, 15 Hofstra L. Rev. at 606–07 (advocating per se exclusion of unnecessarily suggestive identification procedures); Charles A. Pulaski, Neil v. Biggers*: The Supreme Court Dismantles the* Wade *Trilogy's Due Process Protection*, 26 Stan. L. Rev. 1097, 1119–21 (1974) (noting the ways that *Biggers* substantially undermined the due process safeguards of the *Wade* trilogy); David A. Sonenshein & Robin Nilon, *Eyewitness Errors and Wrongful Convictions: Let's Give Science a Chance*, 89 Or. L. Rev. 263, 300–01 (2010) (canvassing advances in scientific evidence as applied to the *Biggers* reliability factors, and finding them "seriously flawed and ineffective").

The opinion of eyewitness scientists is similar. *See, e.g.*, Wells, *Lineups and Photospreads*, 22 Law & Hum. Behav. at 608 (finding the U.S. Supreme Court's safeguards fail to provide intended protection); Wells & Quinlivan, *Suggestive Procedures*, 33 Law & Hum. Behav. at 1 (reviewing studies and questioning the ongoing validity of *Manson*).

The bottom line is expressed in *Jones on Evidence* as follows:

> [T]he due process standard and procedures the Supreme Court [has] promulgated . . . for assessing identification accuracy in criminal cases, including its five factor test, are seriously flawed and in fact may contribute to, rather than reduce, the number of wrongful convictions.

Clifford S. Fishman & Anne T. McKenna, 6 *Jones on Evidence*, § 40:8 (7th ed.), Westlaw (database updated July 2019).

Similarly, another scholar, after analyzing Federal caselaw applying *Manson* in great detail, declared,

> Given ever-mounting proof of the ways that flawed analysis of the reliability of identification evidence can lead to admission of evidence that is, in fact, unreliable, courts must take responsibility for improving their evaluative frameworks to avoid undermining the validity of the conclusions they draw. Finally, given unanimous criticism and irrefutable proof from scientists and legal scholars that *Manson* has been inadequate to guard against admission of unreliable evidence, the Supreme Court must take responsibility for replacing its flawed standard with a workable due process test.

Kahn-Fogel, *Manson Empirical Analysis*, 3 Ala. C.R. & C.L. L. Rev. at 226.

And, finally, another scholar has succinctly stated, "Sadly, the rule of decision set out in *Manson* has failed to meet the Court's objective of furthering fairness and reliability. The results have been tragic." O'Toole, *Due Process Challenges*, 41 Val. U. L. Rev. at 110.

**VI.** *Perry v. New Hampshire*: **Limiting Due Process Analysis to Police-Orchestrated Identification (The State Action Requirement).**

**A. Approach to State Action in Prior Federal Cases.** Prior to *Perry*, 565 U.S. 228, 132 S. Ct. 716, the federal courts were divided on the question of whether a due process attack on an unduly suggestive identification could arise under situations where the identification was not police orchestrated. The First, Second, Sixth and Ninth Circuits held that all unduly suggestive identifications could be attacked regardless of whether there was police orchestration. *See Dunnigan v. Keane*, 137 F.3d 117, 128 (2d Cir. 1998) ("Preliminarily, we note our rejection of the State's contention that no due process scrutiny of [the witness's] pretrial identification was required on the theory that [the individual] who showed the pictures, was a private investigator acting independently, and not as an agent of the police."), *abrogated by Perry*, 565 U.S. at 248, 132 S. Ct. at 730; *United States v. Bouthot*, 878 F.2d 1506, 1516 (1st Cir. 1989) ("[O]verly suggestive identifications are suppressed primarily to avoid an unfair trial."), *abrogated by Perry*, 565 U.S. at 248, 132 S. Ct. at 730; *Thigpen v. Cory*, 804 F.2d 893, 895 (6th Cir. 1986) ("[O]nly the effects of, rather than the causes for, pre-identification encounters should be determinative of whether the confrontations were unduly suggestive."), *abrogated by Perry*, 565 U.S. at 248, 132 S. Ct. at 730; *Green v. Loggins*, 614 F.2d 219, 222 (9th Cir. 1980) ("[D]eterrence of [wrongful police] conduct is not the primary purpose behind judicial review of tainted identification testimony. Rather, a court reviews a challenged in-court identification essentially to determine whether the witness' testimony retains sufficient indicia of reliability."). The Third and Seventh Circuits, however, came to the contrary conclusion. *See United States v. Kimberlin*, 805 F.2d 210, 233 (7th Cir. 1986) ("We do not agree that [a nonpolice-

orchestrated lineup] triggers a due process right to judicial evaluation of the reliability of the in-court identification under [*Biggers*].”); *United States v. Zeiler*, 470 F.2d 717, 720 (3d Cir. 1972) (“Both *Wade* and *Simmons* were concerned with the conduct of law enforcement officials in unfairly influencing identifications.”).  The United States Supreme Court in *Perry* granted certiorari to resolve the split among the circuits on the question.

**B.  *Perry v. New Hampshire*: Turning *Biggers* Upside Down.**  The most recent United States Supreme Court case dealing with eyewitness identification is *Perry*, 565 U.S. 228, 132 S. Ct. 716.  In *Perry*, police responded to an early morning report that an African-American male was breaking into cars in an apartment house parking lot.  *Id.* at 233, 132 S. Ct. at 721.  Police arrived at the scene and discovered Perry, an African-American male, in the parking lot.  *Id.*  An eyewitness described the perpetrator to police in general terms.  *Id.* at 234, 132 S. Ct. at 721. When police asked for a more specific description, the witness, looking out the fourth floor apartment window, identified Perry in the parking lot standing next to the police.  *Id.* at 234, 132 S. Ct. at 722.

About a month later, the police presented the witness with a photo array that included Perry, but the witness could not identify Perry from the presentation.  *Id.*  At trial, the state sought to introduce the prior identification of Perry made from the fourth floor apartment window; Perry attacked the identification as unnecessarily suggestive and amounting to a one person showup.  *Id.* at 234–35, 132 S. Ct. at 722.  Perry was found guilty of theft.  *Id.* at 236, 132 S. Ct. at 723.

The *Perry* Court affirmed the conviction.  *Id.* at 248, 132 S. Ct. at 730.  According to the majority, the primary aim of the exclusion of eyewitness evidence is deterrence of unnecessarily suggestive identification procedures by law enforcement.  *Id.*  In this case, according

to the *Perry* majority, law enforcement did not set up the identification; instead, the witness simply made an identification out of the fourth story window without any suggestion by police. *Id.* at 240–41, 132 S. Ct. at 725–26. As a result, it was not necessary to determine the reliability of the eyewitness testimony. *Id.*

In reaching its conclusion that the due process protections in the *Wade* line of cases did not apply to identifications not involving police orchestration, the *Perry* Court noted that juries, and not judges, traditionally determine the reliability of evidence. *Id.* at 245, 132 S. Ct. at 728. The *Perry* Court observed that procedural safeguards such as cross-examination and jury instructions are available to expose flaws and evaluate credibility of such testimony. *Id.* at 245–47, 132 S. Ct. at 728–29. The Perry Court stated that the constitutional requirement that the state prove guilt beyond a reasonable doubt impedes convictions based on dubious identification evidence. *Id.* at 247, 132 S. Ct. at 729. The Court also noted that the rules of evidence permit trial judges to exclude relevant evidence if its probative value is substantially outweighed by its prejudicial impact. *Id.* And, expert witnesses and jury instructions are available to assist the defense. *Id.* at 245–47, 132 S. Ct. at 728–29.

Justice Sotomayor dissented. *Id.* at 249–65, 132 S. Ct. at 730–40 (Sotomayor, J., dissenting). She noted that the due process concerns expressed in the *Wade* line of cases was rooted not in deterrence but instead on the reliability of the underlying identification. *Id.* at 250, 132 S. Ct. at 731. She saw no meaningful distinction between a suggestive lineup orchestrated by police and a suggestive lineup inadvertently caused by police. *Id.* She noted the "vast body of scientific literature" and "more than 2000 studies" on eyewitness reliability undermine the majority position, yet "merit[] barely a parenthetical mention in the majority

opinion." *Id.* at 262–63, 132 S. Ct. at 738–39. According to Justice Sotomayor,

> Study after study demonstrates that eyewitness recollections are highly susceptible to distortion by postevent information or social cues; that jurors routinely overestimate the accuracy of eyewitness identifications; that jurors place the greatest weight on eyewitness confidence in assessing identifications even though confidence is a poor gauge of accuracy; and that suggestiveness can stem from sources beyond police-orchestrated procedures.

*Id.* at 264, 132 S. Ct. at 739 (footnotes omitted). According to Justice Sotomayor, the majority "adopt[ed] an artificially narrow conception of the dangers of suggestive identifications at a time when [the Court's] concerns should have deepened." *Id.* at 264–65, 132 S. Ct. at 739.

Justice Sotomayor also attacked the majority's reliance on the ordinary trial process to root out unreliable eyewitness identifications, pointing out that this was the position of Justice Black in the dissents in *Foster* and *Simmons* that were not previously adopted by the majority of the Court nor should they be now. *Id.* at 260–61, 132 S. Ct. at 737.

**C. Analysis of *Perry*.**

1. Perry *has no applicability to first-time, in-court identification.* *Perry* seems to draw a bright line between police orchestrated identifications and identification arising out of the conduct of private parties. Plainly, a first-time, in-court identification is infused with state action. The state has arrested the defendant, charged the defendant with a crime, brought the defendant into court, and presented the jury with an eyewitness who knows that the state believes the defendant is the culprit. It is hard to imagine a more intensive state involvement in a suggestive lineup

A contrary view would set a dangerous precedent and invite gamesmanship. Specifically, if the state is concerned that an eyewitness

might be uncertain, it could avoid a nonsuggestive lineup or photo array, and instead present the witness in-court where the defendant is on trial. In the most suggestive environment imaginable, a court of law, where the defendant is facing potentially severe penalties, the witness is then asked to identify the defendant. The witness knows their role, does not want to disappoint, and is inclined to be helpful to the state. Even a witness who could not describe the defendant's facial features contemporaneously with the crime can have a sudden improvement in memory!

2. *Deterrence as primary goal.* It is simply not true that the prior eyewitness identification cases of the United States Supreme Court were based primarily on deterrence. Although such decisions are limited to situations where police have not orchestrated the eyewitness identification, and thus have no application to first-time, in-court identifications, nothing in *Perry*, for instance, establishes this extraordinary proposition. Historically, due process has always been about fundamental fairness toward a defendant or a person otherwise deprived of life, liberty, or property. *See, e.g.*, Tom Pryor, Note, Turner v. Rogers*, the Right to Counsel, and the Deficiencies of* Mathews v. Eldridge, 97 Minn. L. Rev. 1854, 1855 (2013) ("In procedural due process cases . . . the Court typically balances the interests of the individual against society's interests in order to determine whether the costs of additional procedural protections are worth the decreased risk of an erroneous deprivation of rights.").

Indeed, in case after case, the Supreme Court's eyewitness identification cases focused on the reliability of the identifications, not deterrence. For instance, in *Stovall*, the Court noted that "it remains open to all persons to allege and prove . . . that the confrontation resulted in such unfairness that it infringed his right to due process of law," and

further that "[t]his is a recognized ground of attack upon a conviction independent of any right to counsel claim." *Stovall*, 388 U.S. at 299, 302, 87 S. Ct. at 1971, 1972.

Similarly, in *Foster*, 394 U.S. 440, 89 S. Ct. 1127, the Supreme Court declared that "it is the teaching of *Wade*, *Gilbert*, and *Stovall* . . . that in some cases the procedures leading to an eyewitness identification may be so defective as to make the identification constitutionally inadmissible as a matter of law," and further, that in this case, the "[suggestive police] procedure so undermined the reliability of the eyewitness identification as to violate due process." *Id.* at 442 n.2, 443, 89 S. Ct. at 1128 n.2, 1129.

In *Coleman*, 399 U.S. 1, 90 S. Ct. 1999, the Supreme Court repeated its emphasis on fairness by noting that the question was whether the identification process was "so unduly prejudicial and conducive to irreparable misidentification as fatally to taint [the witness's] in-court identifications of [the defendants] at the trial." *Id.* at 3, 90 S. Ct. at 2000.

If there was any doubt, the Supreme Court clearly identified reliability as the lodestar of the due process analysis in *Biggers* and *Manson*. In *Biggers*, the Supreme Court declared that "the primary evil to be avoided is 'a very substantial likelihood of irreparable misidentification' . . . which violates a defendant's right to due process." *Biggers*, 409 U.S. at 198, 93 S. Ct. at 381–82 (quoting *Simmons*, 390 U.S. at 384, 88 S. Ct. at 971). The *Biggers* "primary evil" approach was confirmed in *Manson*, which declared that "reliability is the linchpin in determining the admissibility of identification testimony for both pre- and post-*Stovall* confrontations." *Manson*, 432 U.S. at 114, 97 S. Ct. at 2253. In light of the long line of cases, the majority's apparent adoption of the erroneous

suggestion that the due process cases have been "primarily" about deterrence is simply not correct.

Further, the notion that due process in the context of eyewitness identification is based upon the reliability of the evidence is spot on. Due process historically has always been about fundamental fairness. *See N. C. Dep't of Revenue v. Kimberley Rice Kaestner 1992 Family Tr.*, 588 U.S. ___, ___, 139 S. Ct. 2213, 2219 (2019) ("The Due Process Clause provides that '[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law' . . . [and] 'centrally concerns the fundamental fairness of governmental activity,' " (first quoting U.S. Const. amend. XIV; and then quoting *Quill Corp. v. North Dakota*, 504 U.S. 298, 312, 112 S. Ct. 1904, 1913 (1992), *overruled on other grounds by South Dakota v. Wayfair, Inc.*, 585 U.S. ___, ___, 138 S. Ct. 2080, 2099 (2018)); *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 24–25, 101 S. Ct. 2153, 2158 (1981) ("[T]he requirement of 'fundamental fairness' [in the Due Process Clause is] a requirement whose meaning can be as opaque as its importance is lofty . . . [and applying it] is therefore an uncertain enterprise which must discover what 'fundamental fairness' consists of in a particular situation by first considering any relevant precedents and then by assessing the several interests that are at stake."). The due process incorporation of the Bill of Rights against the states was necessary to provide a defendant with the "fundamental fairness essential to the very concept of justice." *Lisenba v. California*, 314 U.S. 219, 236, 62 S. Ct. 280, 290 (1941). It has repeatedly been said that the "touchstone" of due process is fundamental fairness. *See, e.g., Gagnon v. Scarpelli*, 411 U.S. 778, 790, 93 S. Ct. 1756, 1763 (1973); *United States v. Harrington*, 749 F.3d 825, 828 (9th Cir. 2014); *State v. Melendez*, 834 P.2d 154, 157 (Ariz. 1992); *Salas v. Cortez*, 593 P.2d 226, 229 (Cal. 1979). Searching for the terms "due process" and

"fundamental fairness" together in the same sentence produces thousands of legal cases and scholarly articles. Attempting a similar search for caselaw finding the touchstone of due process is deterrence, however, is fruitless.

It is simply wrong for the Supreme Court to convert the federal constitutional due process protection that a trial be fundamentally fair into some kind of review for police misconduct. The eyewitness identification context is fundamentally different than when exclusion of evidence is sought under search and seizure provisions, where reliable evidence is excluded in order to deter violation of constitutional rights. Here, the exact opposite is taking place. Exclusion occurs not to deter police misconduct, but to ensure the reliability of eyewitness evidence submitted to the jury. Due process in this context requires a laser-like focus on the potential reliability and prejudicial effects of a faulty eyewitness identification. When the focus shifts to police, the tendency is to excuse misconduct, but when the focus is on the fairness of the process to the individual, the outcomes are dictated by the core value of due process: fundamental fairness for the accused.

Further, any distinction between police-orchestrated identification and the identification process in *Perry*, for purposes of fundamental fairness, makes no sense. A wrongly convicted defendant will not sleep better in a prison bed because a highly unreliable eyewitness identification offered by the state in the defendant's criminal prosecution was not a product of explicit state action at the time of the identification. The gist of due process, from the very beginning, has been to guarantee that any action by the state, like a criminal prosecution, is fundamentally fair. The purpose of the Due Process Clause is to protect the defendant from unfair imposition of criminal sanction, not to function as some kind of beneficent

police disciplinary board that gives law enforcement wide latitude in order to maintain morale and obtain convictions by procuring unreliable identification.

3. *Inconsistent application of deterrence goals.* Even on its face, the deterrence rationale in *Perry* is flawed. Under the *Biggers f*ormulation, many unnecessarily suggestive identifications become admissible. As noted in *Biggers*, the deterrence of a per se rule was superior to the ad hoc process of determining reliability based on a number of factors, yet the Court insisted on focusing not on deterrence but instead on the reliability of the underlying confession. In *Bigge*rs, the Court held that deterrence played second fiddle to reliability. Now, in *Perry,* the Supreme Court suggests that deterrence is more important than reliability in a due process attack on an eyewitness identification. It seems the main goal here is not consistency of reasoning but consistency in result: highly suggestive eyewitness identifications are not excluded and can be used to convict defendants.

4. *Reliance on jury to sort out issues of suggestive identification.* Of course, as a general matter, we rely upon juries to find facts. Yet, throughout the law, we refuse to allow admission of evidence for jury consideration. We have an elaborate set of rules of evidence that excludes, for instance, hearsay evidence on the ground that it is unreliable. The admission of hearsay is thought to be so damaging that it is presumed to be prejudicial. *See, e.g.*, Fed. R. of Evid. 802; Iowa R. of Evid. 5.802. We further have a regulatory regime surrounding the admission of other bad acts evidence. *See, e.g.*, Fed. R. of Evid. 404; Iowa R. of Evid. 5.404. Again, evidence of prior bad acts is thought to be simply too prejudicial to be provided to a jury. Finally, we control the admission of expert testimony in order to prevent miscarriages of justice arising from reliance on

unreliable expert testimony. *See, e.g.*, Fed. R. of Evid. 702; Iowa R. of Evid. 5.702. In a wide variety of contexts, then, our legal system does not simply hand evidence to the jury without gatekeeping, and we do not on rely on Wigmore's "engine" of cross-examination to establish reliability of hearsay, other bad acts evidence, or expert testimony, nor should we here.[14] As has been shown above, cross-examination is a limited tool when a lawyer faces a sincere but mistaken eyewitness.

**D. Application of Due Process Challenges to In-Court Identifications.** Prior to *Perry*, a majority of the circuit courts held that a defendant could mount a *Biggers/Manson* due process attack on in-court identifications. *See United States v. Saunders*, 501 F.3d 384, 389–90 (4th Cir. 2007); *United States v. Rattler*, 475 F.3d 408, 411 (D.C. Cir. 2007); *United States v. Jones*, 126 F. App'x 560, 567–69 (3d Cir. 2005); *United States v. Rogers*, 126 F.3d 655, 657–59 (5th Cir. 1997); *United States v. Kime*, 99 F.3d 870, 882–83 (8th Cir. 1996); *United States v. Archibald*, 734 F.2d 938, 940–43 (2d Cir.), *as modified*, 756 F.2d 223 (2d Cir. 1984). In *United States v. Domina*, 784 F.2d 1361 (9th Cir. 1986), the Ninth Circuit reviewed admission of a first-time, in-court identification for abuse of discretion, stating an abuse of discretion would occur if "in-court identification procedures are so ' "unnecessarily suggestive and conducive to irreparable misidentification" as to amount to a denial of due process of

---

[14]We, of course, refer to

Dean and legal scholar John Henry Wigmore [1863–1943], whose greatest contribution was the *Treatise on the Anglo–American System of Evidence in Trials at Common Law* (1904) ["Wigmore on Evidence"], famously described cross-examination as the "greatest legal engine ever invented for the discovery of truth" and "the great and permanent contribution of the Anglo–American system of law to improved methods of trial procedure."

*Barnaby v. Coreman, Inc.*, 890 N.Y.S.2d 291, 293 (Sup. Ct. 2009) (quoting 5 John Henry Wigmore, *Wigmore on Evidence* § 1367, at 32 (Chadbourn rev. 1974)).

law.' " *Id.* at 1369 (quoting *United States v. Williams*, 436 F.2d 1166, 1168–69 (9th Cir. 1970)).

After *Perry*, Federal courts are divided on the question of whether a defendant may launch a due process challenge to an in-court identification. The Fourth and Seventh Circuits have held that the *Biggers* reliability test still applies to in-court identifications. *See Lee v. Foster*, 750 F.3d 687, 691–92 (7th Cir. 2014); *United States v. Greene*, 704 F.3d 298, 308 (4th Cir. 2013). On the other hand, the Tenth and Eleventh Circuits have come to the opposite conclusion. *See United States v. Thomas*, 849 F.3d 906, 911 (10th Cir. 2017); *United States v. Whatley*, 719 F.3d 1206, 1214–17 (11th Cir. 2013).

**VII. State Court Developments Embracing Eyewitness Science.**

**A. Role of State Courts in Development of Law.** Historically, more often than not it has been the state courts that have taken the lead in the development of constitutional law. While cases of the United States Supreme Court often gain the most attention, invariably the seminal cases are based on state court developments. *See* William J. Brennan, Jr., *State Constitutions and the Protection of Individual Rights*, 90 Harv. L. Rev. 489, 490–91 (1977). While many of us attended law schools that focused courses on constitutional law on developments in the Warren Court, it has been the state courts that have been primarily the drivers of the development of legal doctrine. As a result, if we are to have a vibrant legal system, it is important that the state courts embrace their primary role in legal development and not surrender it to an institution that, in large part because of federalism considerations, tends to be an inert and lagging decision-maker. States following the federal approach in lockstep with constitutional issues stifle and inhibit the development of the law.

No one should be surprised that state courts play the leadership role in the development of constitutional law in the criminal justice system. Indeed, that is exactly what the framers of the United States Constitution intended. At the time the United States Constitution was adopted, there were virtually no federal crimes and it was fully expected that criminal justice would be the primary concern of state courts. The framers would have been comfortable with the notion that the state courts would often take the lead in the development of law, with the United States Supreme Court, more often than not, responding to state court developments and not the other way around.

**B. State Court Return to Per Se Rejection of Unnecessary Showups Framework of *Wade/Gilbert/Stovall* Under State Constitutions.**

1. *Introduction.* One approach designed to limit the risk of misidentification in eyewitness testimony is to return to the *Wade/Gilbert/Stovall* approach to the issue where showups are employed. By adopting a per se rule that unnecessarily suggestive identification procedures are inadmissible, courts avoid a slipshod, multifactored case-by-case approach to reliability in favor of a more certain rule for law enforcement to follow and the courts to apply.

2. *New York. B*y the mid-1980s, state courts began to conform their approach to eyewitness identification to bring it more in line with the scientific consensus. By way of example, in *People v. Adams*, 423 N.E.2d 379 (N.Y. 1981), the New York court condemned a showup under the due process clause of the New York Constitution where multiple witnesses were presented with multiple suspects. *Id.* at 383–84. The *Adams* court dubbed the police procedure "the ideal of suggestibility." *Id.* at 383. The *Adams* court rejected the grafting of a reliability test of *Biggers* on such

pretrial showups and declared that under the due process clause of the New York Constitution, the approach adopted in *Stovall* would control. *Id.* at 383–84.

3. *Massachusetts.* In *Commonwealth v. Johnson*, 650 N.E.2d 1257 (Mass. 1995), the Supreme Judicial Court of Massachusetts considered the validity of a suggestive showup under article 12 of the Declaration of Rights of the Massachusetts Constitution. *Id.* at 1260. The *Johnson* court noted that it followed the per se rule previously set forth in the *Wade/Gilbert/Stovall* trilogy in a number of cases but had not had the opportunity to consider whether to apply the approach of *Biggers/Manson.* *Id.*; *see Commonwealth v. Botelho*, 343 N.E.2d 876, 880–81 (Mass. 1976).

The *Johnson* court rejected the invitation to follow *Biggers/Manson* under the Massachusetts due process clause, recognizing the approach in *Manson* "denies the trier reliable evidence, [and so] [the per se approach] may result, on occasion, in the guilty going free." *Johnson*, 650 N.E.2d at 1263 (quoting *Manson*, 432 U.S. at 112, 97 S. Ct. at 2252). But the *Johnson* court declared that the inverse is more likely true, namely, that the admission of unnecessarily suggestive identification procedures under the reliability test would likely result in the innocent being jailed while the guilty go free. *Id.*

Further, the *Johnson* court distinguished its per se exclusionary rule for unnecessarily suggestive showups from the exclusionary rule applied to confessions and the fruits of search and seizure. Unlike the confession and search and seizure settings, the exclusion of suggestive identifications is designed to enhance the reliability of trial and reduce the risk that the wrong person will be convicted as a result of suggestive identification procedures. *Id.* at 1264. According to the *Johnson* court, "The [*Manson*] reliability test hinders, rather than aids, the fair and just administration

of justice by permitting largely unreliable evidence to be admitted directly on the issue of defendant's guilt or innocence." *Id.*

The *Johnson* court also noted that the *Manson* test "does little or nothing to discourage police from using suggestive identification procedures." *Id.* at 1263. The *Johnson* court noted that "[a]lmost any suggestive lineup will still meet reliability standards" and be admitted into evidence despite the unnecessary suggestiveness of the identification procedure. *Id.* (quoting Paseltiner, *Diminishing Protection*, 15 Hofstra L. Rev. at 606).

4. *Wisconsin.* The Wisconsin Supreme Court considered the appropriate approach to showups under the due process clause of article I, section 8 of the Wisconsin Constitution in *State v. Dubose*, 699 N.W.2d 582 (Wis. 2005), *overruled by State v. Roberson*, 935 N.W.2d 813, 816 (Wis. 2019). Prior Wisconsin caselaw had simply applied *Biggers* and *Manson* to eyewitness identifications. *See State v. Wolverton*, 533 N.W.2d 167, 178 (Wis. 1995), *overruled by Roberson*, 935 N.W.2d at 816; *Fells v. State*, 223 N.W.2d 507, 513–14 (Wis. 1974), *overruled by Roberson*, 935 N.W.2d at 816. The defendant in *DuBose* asked the court to revisit its position with regard to the application of *Biggers* and *Manson* under the Wisconsin Constitution. *Dubose*, 699 N.W.2d at 591.

The *Dubose* court began its analysis by recognizing that much new information had been assembled since the court reviewed a showup procedure in *Wolverton*, citing research over the past decade, including the work of Gary Wells, that the court characterized as "impossible for us to ignore." *Id.* at 591. The *Dubose* court concluded that the recent studies confirmed that eyewitness testimony is often "hopelessly unreliable," and that its current approach has significant flaws. *Id.* at 592 (quoting *Johnson,* 650 N.E.2d at 1262). In developing an independent test under

the Wisconsin Constitution, the *Dubose* court returned to examine the two-pronged test in *Stovall* of suggestiveness and necessity, concluding that showups were always suggestive and that the focus of analysis should be on the second *Stovall* prong of necessity. *Id.* at 599. Under the Wisconsin due process test, the *Dubose* court narrowly defined necessity to include only exigent circumstances or an inability to arrest a suspect for lack of probable cause to prevent the police from engaging in a line up or photo array procedure. *Id.* at 593–94.

**C. Modification of *Biggers* Reliability Framework Under State Constitutions.**

1. *Introduction.* While New York, Massachusetts, and Wisconsin returned to a *Wade/Gilbert/Stovall* model for consideration of the admissibility of pretrial showup identifications under their state constitutions, courts in Utah, New Jersey, Connecticut and other states retained the two-step structure of *Biggers/Manson*, yet engaged in substantial revision of the factors to be considered to better conform the law to the consensus eyewitness science. A similar result was obtained through application of local rules of evidence in Oregon and other jurisdictions.

2. *Utah.* In Utah, the evolving caselaw begins with *State v. Long*, 721 P.2d 483. In *Long*, the court considered a claim that the defendant was entitled to an instruction cautioning the jury about the fallibility of eyewitness identifications where such an identification was at issue. *Id.* at 484, 487. In order to answer the issue, the *Long* court canvassed the scientific literature and concluded that it "is replete with empirical studies documenting the unreliability of eyewitness identification." *Id.* at 488. The court further observed that "[p]erhaps it is precisely because jurors do not

appreciate the fallibility of eyewitness testimony that they give such testimony great weight." *Id.* at 490.

The *Long* court observed that courts and lawyers tend to "ignore the teachings of other disciplines, especially when they contradict long-accepted legal notions." *Id.* at 491. As an example, the court noted "the lag between the assumptions embodied in the law and the findings of other disciplines" found in *Biggers.* *Id.* The court noted that several of the criteria listed in *Biggers* were flatly contradicted by empirical studies and that the time had come for a more empirically sound approach. *Id.* The court concluded,

> Given the great weight jurors are likely to give eyewitness testimony, and the deep and generally unperceived flaws in it, to convict a defendant on such evidence without advising the jury of the factors that should be considered in evaluating it could well deny the defendant due process of law under article I, section 7 of the Utah Constitution.

*Id.* at 492.

The Utah Supreme Court built on *Long* in *State v. Ramirez*, 817 P.2d 774 (Utah 1991), *abrogated by State v. Lujan*, 459 P.3d 992, 999 (Utah 2020). In *Ramirez*, a defendant challenged the admission of eyewitness showup testimony. *Id.* at 776–77. The *Ramirez* court noted that by departing from the federal caselaw, it would be better able to craft a more empirically based approach under Utah law. *Id.* at 780. The *Ramirez* court declared that the ultimate question is whether, under the totality of circumstances, the identification was reliable. *Id.* at 781. Reviewing *Long*, the *Ramirez* court retained the first two *Biggers* factors and discarded the last three (accuracy of prior description, level of certainty, and length of time). *Id.* at 779. The *Ramirez* court then added the additional factors of (1) "the witness's capability to observe the event"; (2) "whether the witness's identification was made spontaneously and remained consistent

thereafter, or whether it was the product of suggestion"; and (3) "the nature of the event being observed and the likelihood that the witness would perceive, remember and relate it correctly." *Id.* (quoting *Long*, 721 P.2d at 493). The *Ramirez* court thus pruned unsound criteria in *Biggers* and added science-based criteria which research showed were related to reliability. Under the facts presented in the case, the *Ramirez* court determined that construing the facts in a fashion most favorable to the trial court's determination to admit the evidence, no constitutional error was present. *Id.* at 784.

3. *New Jersey.* In 2011, the New Jersey Supreme Court decided *Henderson*, 27 A.3d 872, in which the court undertook a major review of its approach to eyewitness identification. In order to assist in its deliberations, the court appointed a special master to hold hearings, review pertinent eyewitness science and make recommendations to the court. *Id.* at 877. The *Henderson* opinion begins with an explicit declaration that the scientific evidence reviewed by the special master was reliable. *Id.* Among other findings, the court acknowledged the malleability of memory and the impact of many factors on the reliability of eyewitness identification. *Id.* at 878. According to *Henderson*, misidentification was generally a product of a witness's honest yet mistaken belief. *Id.* at 889.

The *Henderson* court reviewed the United States Supreme Court's approach to eyewitness identification and found it to be inadequate, concluding that *Manson* did not deter police from using suggestive procedures and overestimated the ability of jurors to evaluate testimony for reliability. *Id.* at 918–19. *Henderson* developed a framework for admission of eyewitness evidence obtained through unnecessarily suggestive procedures in New Jersey. *Id.* at 919–22. A defendant may

trigger a pretrial hearing by showing evidence that a system variable could have caused the identification to be suggestive. *Id.* at 920. The burden shifts to the state to show that the identification is reliable. *Id.* If the state succeeds, the burden shifts back to the defendant to show a "very substantial likelihood" of incorrect identification. *Id.*

4. *Oregon.* A year after *Henderson*, the Oregon Supreme Court considered its law of eyewitness identification in *Lawson*, 291 P.3d 673, which surveyed the current eyewitness science and concluded that its prior approach, which was similar to the *Biggers* test, was no longer adequate. *Id.* at 677. The *Lawson* court replaced its prior approach with a regime based upon the Oregon Evidence Code (OEC). *Id.* The new framework adjudged that eyewitness identification must be based on personal knowledge, and must be rationally based and "helpful to the trier of fact" under Oregon Evidence Code 602 and 701, respectively. *Id.* at 692–94. If these tests are met, the identification is admissible unless the defendant can show that the evidence is substantially more prejudicial than probative under Oregon Evidence Code 403. *Id.* at 694. The *Lawson* court listed a number of variables that could be considered by courts in making the determination as to whether to admit evidence, but the *Lawson* court gave trial courts broad discretion in determining whether to admit the eyewitness evidence. *Id.* at 694–97.

5. *Alaska.* In 2009, the Alaska Court of Appeals highlighted the weakness in the way courts evaluated the reliability of eyewitness testimony under *Manson. Tegoseak v. State*, 221 P.3d 345, 350–63 (Alaska Ct. App. 2009). The Alaska Supreme Court then considered in 2016 the continued vitality of the *Biggers/Manson* approach under the due process clause of the Alaska Constitution in *Young*, 374 P.3d 395.

The *Young* court determined that any eyewitness identification error that might have occurred in the case was harmless. *Id.* at 409–10. Nonetheless, while the court stated it generally refrained from issuing advisory opinions, it at times set aside the policy of self-restraint to correct or clarify important aspects of the law. *Id.* at 412–13. The *Young* court proceeded to reevaluate the *Biggers/Manson* framework.

The *Young* court determined that it was time to abandon the *Biggers/Manson* framework for a science-based approach, emphasizing the explosion of eyewitness science after the 1970s. *Id.* at 414. The *Young* court noted that it had adopted the *Biggers/Manson* framework of reliability without reference to whether its assumptions were scientifically valid. *Id.* at 415. The legal landscape, however, according to the Young court, had changed. *Id.* The *Young* court noted that a primary goal of the criminal justice system was "to protect the innocent accused against an erroneous conviction." *Id.* at 416 (quoting *Shaw v. State*, 861 P.2d 566, 570 (Alaska 1993)).

The court concluded that the five *Biggers* factors did not consider many of the factors known to impact reliability of eyewitness identifications. *Id.* at 425. Further, the court noted that three of the *Biggers* factors rely on the witness's own subjective perceptions, and therefore the court questioned the reliability of witness confidence in light of the eyewitness science. *Id.* at 426. According to the *Young* court,

> [b]ecause the [*Manson*] test assesses reliability only after the defendant has shown that the procedure was unnecessarily suggestive, the test could have the perverse effect of making it *more likely* an improperly suggestive procedure will be found reliable and admissible, because the suggestiveness itself has made a witness more certain.

*Id.*

6. *Connecticut.* As in Utah, the evolution of law in Connecticut began with a case which considered a relatively narrow issue. In *Guilbert*, 49 A.3d 705, the defendant challenged his conviction based on the refusal of the trial court to allow the admission of expert testimony on the fallibility of eyewitness identification testimony. *Id.* at 712. Prior Connecticut caselaw held that such testimony would invade the province of the jury. *Id.*; *see, e.g., State v. McClendon*, 730 A.2d 1107, 1114–15 (Conn. 1999), *overruled by Guilbert*, 49 A.3d at 712; *State v. Kemp*, 507 A.2d 1387, 1389 (Conn. 1986), *overruled by Guilbert*, 49 A.3d at 712.

The *Guilbert* court, however, determined that the time had come to overrule prior precedent prohibiting expert eyewitness testimony. *Id.* at 712. Noting widespread judicial recognition that eyewitness identifications were potentially unreliable in a variety of ways unknown to the average juror, the court found that the broad based judicial recognition tracked a "near perfect scientific consensus." *Id.* at 721. Among other things, the *Guilbert* court provided a nonexhaustive list of concepts that courts across the country now accepted:

> (1) there is at best a weak correlation between a witness' confidence and his or her identification and its accuracy, (2) the reliability of an identification can be diminished by a witness' focus on a weapon, (3) high stress at the time of observation may render a witness less able to retain an accurate perception and memory of the observed events, (4) cross-racial identifications are considerably less accurate than same race identifications, (5) a person's memory diminishes rapidly over a period of hours rather than days or weeks, (6) identifications are likely to be less reliable in the absence of a double-blind, sequential identification procedure, (7) witnesses are prone to develop unwarranted confidence in their identifications if they are privy to postevent or postidentification information about the event or the identification, and (8) the accuracy of an eyewitness identification may be undermined by unconscious transference, which occurs when a person seen in one context is confused with a person seen in another.

*Id.* at 721–23 (footnotes omitted). The *Guilbert* court determined that while these findings were widely accepted by scientists, they were largely unfamiliar to the average person and that, in fact, many of the findings were counterintuitive. *Id.* at 723.

The *Guilbert* court considered whether cross-examination was adequate to identify the weakness of eyewitness testimony, and ultimately concluded that it was not for several reasons. Most importantly, cross-examination is far better at exposing lies than sincere but mistaken beliefs. *Id.* at 725. Cross-examination also cannot effectively educate the jury about the importance of factors affecting eyewitness identification. *Id.* at 726.

The *Guilbert* court also considered the curative efficacy of jury instructions, determining that jury instructions in broad terms are ineffective compared with expert testimony. *Id.* at 726–27. Further, jury instructions generally come at the end of trial, when jurors are likely to have formed opinions on the witness testimony and are likely to be fatigued after a long trial. *Id.* For the above reasons, the *Guilbert* court reversed its prior precedent and held it was error for the district court to refuse to allow admission of eyewitness testimony. *Id.* at 735–38.

*Guilbert* foreshadowed the later case of *State v. Harris*, 191 A.3d 119 (Conn. 2018). *Harris* reversed course from an earlier case, *State v. Ledbetter*, 441 A.2d 595 (Conn. 1981), where the Connecticut Supreme Court rejected a request to depart from *Biggers* under the Connecticut Constitution. In *Harris,* the defendant challenged under both the State and Federal Constitutions a pretrial identification that occurred at his arraignment and a subsequent in-court identification. *Harris*, 191 A.3d at 122–23. The *Harris* court first determined that the original identification was unnecessarily suggestive as only nine of the persons being arraigned

were African-American and there were marked dissimilarities between each of those and the witness's original description of the culprit. *Id.* at 127–30. The court then examined whether the product of the unnecessarily suggestive procedure was nonetheless reliable. *Id.* at 130. Applying the five *Biggers* factors, the court determined that the identification was sufficiently reliable under the Federal Constitution. *Id.* at 132.

The *Harris* court then turned to consider whether to adopt a different approach under article first, section 8 of the Connecticut Constitution, noting that in *Guilbert*, it adopted a framework for analyzing eyewitness identification claims different than *Biggers*. *Id.* at 136. The court found that the *Guilbert* approach was preferable as, among other things, it provided greater specificity on the value of confidence statements and included factors not recognized in *Biggers*, including weapon focus, level of stress at the time of observation, cross-racial misidentification, postevent exposure to information, and potential for unconscious transference. *Id.* at 136–37.

In support of its independent state constitutional approach, the *Harris* opinion cited courts in Alaska, Kansas, Massachusetts, New Jersey, New York, Utah, and Wisconsin that have held that the *Biggers* formulation insufficiently protected against the risks of misidentification. *Id.* at 142. Further, the opinion noted that courts in Georgia and Oregon came to the same conclusion as a matter of evidence law. *Id.* The *Harris* court asserted that only two states, Idaho and New Hampshire, had explicitly adopted *Biggers*, but the courts in these states did not engage in any analysis of independent scientific developments that have exposed the deficiencies of the *Biggers* reliability test. *Id.*; *see State v. Buti*, 964 P.2d

660, 665–66 (Idaho 1998); *State v. Leclair*, 385 A.2d 831, 833–34 (N.H. 1978).

*Harris* proceeded to develop a procedural framework to consider eyewitness identification challenges under the Connecticut Constitution, finding that a defendant may trigger a pretrial hearing by presenting "some evidence that a system variable undermined the reliability of the eyewitness identification." *Harris*, 191 A.3d at 143. The burden then shifts to the prosecution to show that the identification was reasonable, taking into account all estimator and system variables. *Id.* If the prosecution meets its burden, the burden shifts back to the defendant to show "very substantial likelihood of misidentification" in order for the evidence to be excluded. *Id.* In establishing criteria for making a reliability determination, *Harris* relied on *Guilbert*, 49 A.3d at 731–32, where the court identified eight factors about which eyewitness experts could testify. *Harris*, 191 A.3d at 144. In addition to a motion to suppress, a defendant could also seek to admit expert testimony and obtain instructions on the fallibility of eyewitness identification evidence. *Id.* at 144–45.[15]

**D. Post-*Perry* State Court Application of Eyewitness Science to First-Time, In-Court Identifications.**

1. *Introduction.* After *Perry*, there has been a question as to whether due process protections apply at all with respect to in-court identifications where there has been no suggestive pretrial identification. There is recognition in both state and federal courts that the *Perry* Court did not expressly decide the issue. *See State v. Dickson*, 141 A.3d 810, 821 (Conn.

---

[15]A number of other state courts have departed from *Biggers*. *See, e.g., State v. Almaraz*, 301 P.3d 242, 252–53 (Idaho 2013) (adding onto *Biggers* factors arising from system and estimator variables established by eyewitness science); *State v. Hunt*, 69 P.3d 571, 576 (Kan. 2003) (adopting expanded science-based factors beyond *Biggers*); *State v. Discola*, 184 A.3d 1177, 1188 (Vt. 2018) (abandoning witness certainty as a factor).

2016) ("The United States Supreme Court has not yet addressed the question of whether first-time in-court identifications are in the category of unnecessarily suggestive procedures that trigger due process protections."); *Galloway v. State*, 122 So. 3d 614, 663 (Miss. 2013) ("The United States Supreme Court has not decided whether *Biggers* applies to an in-court identification not preceded by an impermissibly suggestive pretrial identification."). As noted above, the post-*Perry* federal courts are divided on this question. The question has also arisen in a number of state courts, which are similarly divided on whether judicial prescreening for reliability applies in the context of a first-time, in-court identification.

2. *Massachusetts.* In *Commonwealth v. Crayton*, 21 N.E.3d 157 (Mass. 2014), the Massachusetts Supreme Court considered the question of admissibility of first-time, in-court identifications under the due process clause of article 12 of the Massachusetts Declaration of Rights. *Id.* at 161, 164. The *Crayton* court reviewed Massachusetts caselaw noting that showups were disfavored because they were highly suggestive. *Id.* at 165. Explicitly in *Commonwealth v. Johnson*, 650 N.E.2d 1257, 1261 (Mass. 1995), the Supreme Judicial Court of Massachusetts ruled that unnecessarily suggestive showups were subject to a per se rule of exclusion, and that the Massachusetts Constitution "requires the application of [a] stricter per se approach."

The *Crayton* court emphasized that in-court identification of the defendant is also highly suggestive. *Crayton*, 21 N.E.3d at 166. Indeed, the *Crayton* court noted that in-court identification may be even more suggestive a showup as the presence in the courtroom is likely to be understood as a confirmation that the prosecutor believes that the defendant committed the crime. *Id.* (citing Evan J. Mandery, *Due Process*

*Considerations of In-Court Identifications*, 60 Alb. L. Rev. 389, 415–16 (1997)).

The *Crayton* court considered ways in which an in-court identification differs from showups. While a jury is able to see the identification process and may be better able to assess the confidence level of the witness, the court did not believe those features lead to more reliable assessments of eyewitnesses. *Id.* at 168. The court noted that "[s]ocial science research has shown that a witness's level of confidence in an identification is not a reliable predictor of the accuracy of the identification, especially where the level of confidence is inflated by its suggestiveness." *Id.* Further, the court recognized that a witness is subject to cross-examination when an in-court identification is made, but the court was not persuaded that the immediacy of cross-examination outweighed the suggestiveness of the lineup. *Id.* Third, the *Crayton* court noted that where the prosecutor provides defense counsel with advance warning, there is an opportunity to arrange for less suggestive identification. *Id.* at 169. The court concluded that the proper approach was to place the burden on the prosecution to move in limine for an in-court identification and to develop alternatives to a suggestive process. *Id.* at 170–71. Under the facts of the case, however, the *Crayton* court concluded that the in-court identification was unreliable and vacated the defendant's conviction. *Id.* at 179.

3. *Connecticut.* The Connecticut Supreme Court considered the admissibility of first-time, in-court identifications in *Dickson*, 141 A.3d 810. In *Dickson*, a witness who could not identify the defendant in a photo array made an in-court identification of the defendant who was one of only two African-Americans in the courtroom and was seated at counsel table. *Id.* at 823. The court deemed any claim under the Connecticut

Constitution waived and considered only whether the in-court identification violated the Fifth and Fourteenth Amendments of the United States Constitution. *Id.* at 818–19. The *Dickson* court noted that whether in-court identification was subject to due process attack was an open question under *Perry*, stating that the question in *Perry* was whether an identification that was the result of suggestive *private* conduct triggered due process protection. *Id.* at 827–28.

The court determined in *Dickson* that an in-court identification was unduly suggestive and subject to due process protection under the United States Constitution under several theories. First, if the in-court identification in this case was not suggestive, there would be no procedure that was suggestive. *Id.* at 822–23. Second, the in-court identification procedure amounted to a vouching of the witness by the government. *Id.* Third, the *Dickson* court emphasized that misidentifications were a significant cause of wrongful convictions. *Id.* at 823–24. Fourth, state action subject to due process occurs when a prosecutor elicits an in-court identification from a witness. *Id.* at 824. Fifth, the court found that the purpose of excluding suggestive identifications under the United States Constitution, deterrence, applied equally to prosecutors as to law enforcement officers. *Id.*

The *Dickson* court rejected the view that a jury could effectively evaluate in-court identifications, finding that because of its inherently suggestive nature, a witness is far less likely to be hesitant or uncertain when making a suggestive in-court identification. *Id.* at 832. The court also found that curatives like cross-examination are inadequate, citing its previous decision in *Guilbert* for the proposition that "cross-examination is far better at exposing lies than at countering sincere but mistaken beliefs." *Id.* at 832 (quoting *Guilbert*, 49 A.3d at 725). While the *Dickson*

court recognized contrary authority, it concluded that "the arc of logic trumps the weight of authority," finding "no reason to distinguish inherently suggestive in-court identifications from inherently suggestive out-of-court identifications." *Id.* at 827. Notwithstanding its determination that the highly suggestive in-court identification violated due process, the *Dickson* court concluded, based upon the evidence of the case, that the error was harmless under the facts as presented. *Id.* at 844.

4. *Montana.* In 2016, the Montana Supreme Court updated their approach to in-court eyewitness identification in *City of Billings v. Nolan*, 383 P.3d 219 (Mont. 2016). This case began with a road rage incident, in which the eyewitnesses were being threatened by an individual driving a car erratically, screaming, and honking at them. *Id.* at 221–22. Not only was this a high-stress situation, with the individuals driving defensively between fifty and seventy miles per hour, but this also involved cross-racial identification between the witnesses and alleged aggressor. *Id.* An officer observed a driver in a car matching the description from dispatch of the aggressor somewhat proximate to the incident. *Id.* at 222. The officer was "confident of his identification [of the defendant] based on his own observations" and did not ask the eyewitnesses to do a photo lineup. *Id.*

At trial, the defendant objected to a first-time, in-court identification as he was "the only black male in the courtroom and . . . seated next to defense counsel at the table for the defendant." *Id.* The judge responded, "[T]here's nothing I can do about it. What do you want me to do? Get three more defendants in here . . . that are black?" *Id.* The Montana Supreme Court on appeal found that due process rights under the U.S. Constitution barred admission of impermissibly suggestive first-time, in-court identification, adopting a two-prong *Biggers* substantial likelihood of

irreparable misidentification and unreliability standard. *Id.* at 224. In this case, the court found that the first-time, in-court identification was impermissibly suggestive, but that the identification by the eyewitness was nonetheless reliable. *Id.* at 224–25.

5. *Alaska.* As indicated above, the Alaska Supreme Court revisited its approach to eyewitness testimony under the due process clause of the Alaska Constitution in *Young,* 374 P.3d 395. Yet, the *Young* court held that due process protections do not extend to first-time, in-court identifications. *Id.* at 411–12. The *Young* court noted that the jurors observe the circumstances of the identification and expert witnesses may testify about the problems of first-time, in-court identifications. *Id.* The court also noted that a trial court could grant a request for an in-court lineup or a request that the defendant be seated elsewhere than at counsel table. *Id.*

6. *Colorado.* The Colorado Supreme Court considered whether in-court identification was subject to due process protection in *Garner v. People,* 436 P.3d 1107 (Colo. 2019), *cert. denied* 140 S. Ct. 448 (2019). The opinion does not state whether the claim is made under the due process clause of the State or Federal Constitution. The opinion itself, however, focuses on the federal caselaw related to eyewitness identification. *Id.* at 1110. The *Garner* court concluded that the reasoning utilized by the U.S. Supreme Court in *Perry,* namely, that in-court identification involves no improper law enforcement action, that judicial prescreening of reliability was not required in all cases, and that ordinary safeguards of the trial are sufficient, apply in all cases involving in-court identification. *Id.* at 1117.

**E. Iowa's Approach to Due Process Under the Iowa Constitution.**

1. *Due process clause under the Iowa Constitution.* Article I, section 9 of the Iowa Constitution provides that "no person shall be deprived of life, liberty, or property, without due process of law." Iowa Const. art. I, § 9. Although the language is similar to the Due Process Clause of the United States Constitution, we may construe the provision in a different fashion than federal precedent. *See, e.g., State v. Pals*, 805 N.W.2d 767, 771 (Iowa 2011) ("While these [Iowa and United States Constitutional] provisions use nearly identical language and were generally designed with the same scope, import, and purpose, we jealously protect this court's authority to follow an independent approach under our state constitution."). Indeed, at the Iowa constitutional convention, floor debates show derision for the due process decisions of the United States Supreme Court to fugitive slaves. For example, the fugitive slave decisions were decried at the Iowa constitutional convention in 1857. According to George Ells, the Due Process Clause was "violated again and again by the dominant party in the land, which rides rough-shod over the necks of freemen." 1 The Debates of the Constitutional Convention of the State of Iowa 102 (W. Blair Lord rep., 1857), https://www.statelibraryofiowa.org/ services/collections/law-library/iaconst. Ells further opined that

> [i]f the words "due process of law," shall in time be recognized by our judicial tribunals to mean what they really do mean, . . . [t]hen, sir, that infamous Fugitive Slave Law will become a nullity, and the American people will trample its odious enactments in the dust.

*Id.*

We have considered challenges to convictions based upon the admission of eyewitness identification in a number of cases. Some cases

involve due process challenges brought under the United States Constitution. *See State v. Whetstine,* 315 N.W.2d 758, 764–65 (Iowa 1982); *State v. Mark,* 286 N.W.2d 396, 405 (Iowa 1979). In other cases, the opinions do not indicate whether the challenge is brought under the State or Federal Constitution. *See State v. Webb,* 516 N.W.2d 824, 829–30 (Iowa 1994). In one case, the defendant cited article I, section 9 of the Iowa Constitution, but did not suggest a different analytical framework. *State v. Taft,* 506 N.W.2d 757, 762–63 (Iowa 1993). Where citations to the Iowa Constitution are mere constitutional hitchhikers, or where the parties do not indicate whether the case is brought under the State or Federal Constitution, we ordinarily apply the established federal framework but reserve the right to apply the framework in a fashion different than the federal courts. *State v. Baldon,* 829 N.W.2d 785, 822–23 (Iowa 2013). The important point, however, is that we have not had an occasion where a party has asked us to depart from the established federal eyewitness identification due process framework. The issues before us today are questions of first impression.

2. *Iowa due process framework embraced in* State v. Cox. We considered a due process challenge to the admission of evidence under article I, section 9 of the Iowa Constitution in *State v. Cox,* 781 N.W.2d 757 (Iowa 2010). In *Cox,* the defendant was charged with sexual abuse of a younger cousin. *Id.* at 759. The state introduced evidence that the defendant had sexually abused two other cousins. *Id.* The question posed in the case was whether the introduction of the crimes allegedly committed by the defendant against others violated due process under the Iowa Constitution. *Id.* at 761.

We noted that under Iowa Rule of Evidence 5.404(b), evidence of other crimes or wrongs is generally not admissible to show that a person acted in conformity with them. *Id.* at 760. The rule

> is founded not on a belief that the evidence is irrelevant, but on a fear that juries will tend to give it excessive weight, and on a fundamental sense that no one should be convicted of a crime based on his or her previous misdeeds.

*Id.* (quoting *State v. Sullivan*, 679 N.W.2d 19, 24 (Iowa 2004)). While the prior crimes seemed excludable under rule 5.404(b), the legislature enacted a statute that appeared to override the rule and allow for admissibility of prior crimes in sex abuse cases. *See* Iowa Code § 701.11 (2007). The question thus became whether Iowa Code section 701.11 could be constitutionally applied in the case at hand.

In *Cox*, we held that the statute could not be constitutionally applied against Cox and that the evidence of his other crimes was inadmissible under the due process clause of the Iowa Constitution. *Id.* at 768–72. We did so "[b]ased on Iowa's history and the legal reasoning for prohibiting admission of propensity evidence out of fundamental conceptions of fairness." *Id.* at 768. In precedent caselaw we found that "it would be extremely difficult for jurors to put out of their minds knowledge [of past crimes] and not allow this information to consciously or subconsciously influence their decision." *Id.* at 769 (quoting *State v. Reynolds*, 765 N.W.2d 283, 292 (Iowa 2009), *overruled on other grounds by Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 708 & n.3 (Iowa 2016)).

Several propositions were embraced in *Cox*. First, the Iowa Constitution could be construed to provide more due process protection than its federal counterpart. *Id.* at 761. Second, a due process claim could arise under the due process clause of the Iowa Constitution that would exclude evidence from trial based on fundamental fairness. *Id.* at 767–68.

Third, some types of evidence, such as prior bad acts evidence, is so troubling that it should not go to the jury. *Id.* at 769–70. Fourth, although not stated expressly in the opinion, by their notable omission as curatives it is implied that cross-examination and jury instructions would not remedy the constitutional error. Fifth, the evidence is this case was not police generated, but the only state action was to offer the evidence at trial as part of the prosecution's case. Sixth, there is no mention of deterrence in this due process case, only fundamental fairness. As is apparent, although it does not deal with eyewitness identification, *Cox* runs dead against the due process approach of *Perry* requiring police orchestration, relying on trial processes, emphasizing the function of the jury, and focusing on deterrence rather than fundamental fairness in its due process analysis.

**VIII. Iowa Due Process Analysis of In-Court Identification in this Case.**

**A. Introduction.** There are two general approaches to the identification issues in this case. First, we could lockstep Iowa law with federal precedent, embrace *Biggers* and *Perry* notwithstanding the consensus eyewitness science, and decline to think about it any further. In short, we function as if we were a municipal federal criminal claims court and consign the Iowa Constitution on long-term loan to the Iowa Historical Museum.

If we take this course, however, we must consider the question open under *Perry* as to whether the in-court identification in this case remains subject to a challenge under *Biggers*. If so, we must then apply the antiquated *Biggers* factors, recognizing that a delay of identification of seven months in *Biggers* is construed as a very serious factor against reliability. Indeed, because the eyewitness identification in the case before

us is so suggestive and so unreliable even under the *Biggers* factors, there is strong possibility that due process would require exclusion of Brkovic's in-court identification even under current federal law.

A second approach is to recognize the consensus eyewitness science and develop a science-based approach to eyewitness evidence under the due process clause of the Iowa Constitution. There are at least two potential approaches here. First, we could adopt a per se approach to in-court identifications similar to that adopted by the New York, Massachusetts, and Wisconsin Supreme Courts for showup identifications. Second, we could evaluate the admission of an in-court eyewitness identification under a modified *Biggers* approach that eliminates scientifically unsound factors and adds estimator and system variables to the due process test.

**B. Rejection of Federal Approach.** Historically, the United States Supreme Court often lags behind legal developments in the states. As we have seen, eyewitness identification doctrine is no exception. The developments in eyewitness science, however, make adherence to the established federal approach untenable. Continued use of the federal framework will simply perpetuate a system of criminal justice where highly unreliable eyewitness identifications convict innocent persons. The *Biggers* factors are demonstrably flawed by their inclusion of irrelevant factors, the impact of improper suggestiveness on reliability factors, and the exclusion of important estimator and system variables that impact the likelihood of accurate eyewitness identifications.

The *Perry* approach is unpersuasive on many levels. First, it is simply not true that due process claims related to the introduction of eyewitness evidence have been based primarily in deterrence. Fundamental fairness and reliability are the principles underlying due

process and, as suggested in *Manson,* "the reliability is the linchpin." *Mason,* 432 U.S. at 114, 97 S. Ct. at 2253. Further, nothing in the prescience *Biggers* factors meaningfully deters unreliable testimony. The notion of an unduly suggestive but reliable identification is hard to grasp, particular when the more suggestive the identification process, the more likely a witness will demonstrate the presence of *Biggers* factors that establish "reliability."

A per se approach that declares that in-court identifications are not subject to due process screening is hard to fathom. The suggestiveness of an in-court identification is of the highest order and yet, an in-court identification often powerfully affects juries and may make the difference between conviction and acquittal.

On the state action issue, *Perry* is wrong. A state orchestrated, first-time in-court identification crashes full speed into the reliability parameters previously embraced by the courts and are currently capable of being informed by eyewitness science. In *In re Winship,* 397 U.S. 358, 90 S. Ct. 1068 (1970), no one asked whether state action was involved in the due process challenge to a criminal conviction not based upon substantial evidence. In *Napue v. Illinois,* 360 U.S. 264, 269–70, 79 S. Ct. 1173, 1177 (1959), the Supreme Court held that a due process violation arose when a prosecutor introduced false evidence. *In re Winship* and *Napue* teach that prosecutorial actions are state actions for purposes of due process.

Further, our decision in *Cox* cuts dead against *Perry.* In *Cox,* the state sought to admit evidence of prior sexual misconduct. 781 N.W.2d at 759. The state's effort to introduce evidence was sufficient state action in *Cox* to give rise to a due process claim under article I, section 9 of the Iowa Constitution. *Id.* at 761–62.

Further, the approach in *Perry* is also an invitation to abuse. For example, a witness incapable of making an identification in a lineup of an African-American defendant may walk into a courtroom and identify the defendant, the only African-American present, as the culprit without judicial intervention. *See Perry*, 565 U.S. at 236–48, 132 S. Ct. at 723–30. A prosecutor who knows that this witness may not be able to make an identification from a nonsuggestive identification process can simply bring the witness into the highly suggestive courtroom, where the likelihood of identification of the defendant is dramatically higher than in a nonsuggestive procedure. Where the state has a doubtful eyewitness, it is better off avoiding a disciplined nonsuggestive identification procedure and simply presenting the witness in court for highly suggestive, unreliable in-court identification. Indeed, all of the law that has been constructed to control the reliability of pretrial identification can be unilaterally dismantled by simply avoiding a pretrial identification process. Further, the notion that first-time in-court eyewitness identifications can be defended by effective cross-examination is wholly unmoored from reality. While cross-examination can be an effective tool to expose liars, it is completely ineffective for persons who honestly, but mistakenly, believe in the accuracy of their testimony. As every trial lawyer knows, a frontal attack in cross-examination of an eyewitness who honestly believes his testimony is often counterproductive. Those who have tried such a frontal attack on sincere witnesses generally regret it.

There are potential remedies other than exclusion. For example, a defendant may call an expert witness to explain the developments of eyewitness science and may seek a jury instruction tailored to it. But the research indicates that jurors are simply not sufficiently sensitive to the nuances of eyewitness identification. If we exclude evidence of prior bad

acts from a jury because of their potentially prejudicial effect, or exclude highly relevant hearsay, or exclude bad science through a mechanism of judicial prescreening, we should be able to do the same for in-court identification where there is strong likelihood of unreliability.

**C. Proper Approach to In-Court Identifications Under the Due Process Clause of the Iowa Constitution.** Having rejected the view that first-time, in-court identifications are not outside due process protections, the question is what approach to take under article I, section 8 of the Iowa Constitution.

On the one hand, we could adopt the per se approach generally applied in New York, Massachusetts, and Wisconsin and specifically applicable with regard to in-court testimony in *Crayton* and *Dickson.* If we did so, reversal would clearly be required in this case. There was no necessity of the in-court identification in this case, and it was obviously highly suggestive.

The advantage of the per se approach is that it tends to avoid ad hoc judgments on reliability that provide trial courts with little guidance and produce inconsistent results. It would require law enforcement seeking to introduce eyewitness testimony in-court in most cases to engage in a nonsuggestive, science based pretrial identification procedure. To the extent deterrence is a goal, as claimed by *Perry*, the per se rule would be very effective, and it would promote fundamental fairness in the development of what is often highly unreliable but persuasive testimony. On the other hand, we could adopt a multifactored reliability test that drops or modifies scientifically unsupportable criteria in *Biggers* and replaces them with factors identified by the eyewitness science. The advantage of such an approach is its flexibility. The disadvantage is that

it would require ad hoc judgments by district courts. Disagreements over application of ad hoc multifactored test permeate *Bigger*s and *Manson.*

The wisest path forward is to adopt a per se approach like that in *Crayton* and *Dickson.* First-time, in-court identifications would not be admissible absent a prior identification made through a nonsuggestive process. If the witness failed pretrial to identify the suspect, "[t]he state is not entitled to conduct an unfair procedure merely because a fair procedure failed to produce the desired result." *Dickson,* 141 A.3d at 830. The prosecution has the burden of showing a proper pretrial identification occurred. *Id.* at 825–26.

In the alternative, if we were to adopt a science-based modification of the *Biggers* test, the eyewitness identification in this case would be excluded. The event happened under poor illumination. The witness had a short period of time to observe the perpetrator, the perpetrator was wearing a hat, the perpetrator had a gun, and whatever observation of the perpetrator was made by the eyewitness was made during a time of great stress. Shortly after the event, the eyewitness could not provide a meaningful description of the defendant. All of these factors weigh heavily against reliable identification contemporaneously in this case, let alone at a later date. Then, two years later, in a remarkable turn of events, the eyewitness makes an in-court identification of the defendant, whom he could not describe a few hours after the event. In my mind, such an identification, given what we know about eyewitness science, has "a very substantial likelihood of irreparable misidentification." *Biggers,* 409 U.S. at 198, 93 S. Ct. at 381 (quoting *Simon,* 390 U.S. at 384, 88 S. Ct. at 971).

**IX. Ineffective Assistance of Counsel.**

In this case, Doolin's counsel did not seek suppression of the in-court identification. As a result, we can reach the merits of this case only

if his failure to seek suppression amounts to ineffective assistance of counsel. The parties agree that the proper test of ineffective assistance in this case is provided in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984), finding "[a]s all the Federal Courts of Appeals have now held, the proper standard for attorney performance is that of reasonably effective assistance."

The first prong of *Strickland* requires an examination of whether Doolin's counsel fell below the level of competence expected of Iowa attorneys. The majority properly states that in order to establish a violation of the first *Strickland* prong, a defendant must show that his counsel failed to pursue "a claim 'worth making.'" *State v. Halverson*, 857 N.W.2d 632, 634 (Iowa 2015); *see State v. Graves*, 668 N.W.2d 860, 882 (Iowa 2003).

A reasonably competent lawyer should have been aware of the legal issues surrounding eyewitness development. The science has been around for decades. More than a decade ago in *State v. Folkerts*, 703 N.W.2d 761, 765 (Iowa 2005), we were highly critical of what amounted to a one person showup at a defendant's criminal deposition. In that case, we noted that litigating an in-court identification that was "so clearly suggestive as to be impermissible" was "a waste of judicial resources and time" and that counsel should "avoid[] a situation that will likely create an impermissibly suggestive procedure and result in an inadmissible identification." *Id.*

Further, in *Folkerts* we cited the work of Gary Wells that summarized developments in eyewitness science. *Id.* (citing Gary L. Wells, *Eyewitness Identification Evidence: Science and Reform*, 29 Champion 12 (2005)). A computerized search of authorities citing *Folkerts* would reveal a 2009 student note in the Drake Law Review provided a summary of the issues

surrounding eyewitness identification and urged a change in Iowa law. Erica A. Nichols, Note, *The Dangers of Eyewitness Identifications and the Need for Change in Iowa*, 57 Drake L. Rev. 985, 995–98, 1004 (2009). A computer search of the catalogue of the Drake Law Library would have revealed troves of comprehensive secondary sources on eyewitness identification, including the work of Gary L. Wells and Elizabeth Loftus.

On top of these Iowa developments, the issue of eyewitness identification has been among the most visible issues nationally. *Henderson* and *Lawson* were indicators of fermentation in the issue in state courts, and *Perry* indicated the question of eyewitness identifications remained a very important part of the national legal dialogue.

Under Iowa Rules of Professional Conduct 32:1.1 and 32:1.3, Iowa attorneys must act with reasonable diligence and reasonable competence in handling matters for their clients. And indeed, part of a lawyer's duty of reasonable competence is maintaining competence through "keep[ing] abreast of changes in the law and its practice, including . . . relevant technology . . . [and] continuing study and education . . . ." Iowa R. of Prof'l Conduct 32:1.1 cmt. [8]. As I see it, ignorance of caselaw, legal trends, and changing science generally violates these professional obligations of attorneys. Under these circumstances, reasonably competent counsel should have known that a challenge to the admission of the in-court identification in this case was a claim worth making.

The second prong of the *Strickland* test is prejudice. *Strickland*, 466 U.S. at 694–95, 104 S. Ct. at 2068. Under our approach, it is not necessary that the defendant show it more likely than not that conviction would not have resulted, but only that the alleged legal error undermines our confidence in the verdict. *State v. Clay*, 824 N.W.2d 488, 496 (Iowa 2012).

The State does not argue that the prejudice prong has not been met in this case. That showed good sense. In this case, there was no other eyewitness identification. The evidence showed that Doolin was under arrest at about 1:10 a.m., but Brkovic's friend testified that the incident happened ten or fifteen minutes before police returned to Flirts for a second time that evening at 2:40 p.m. At the time the alleged crime occurred, according to Brkovic's friend, Doolin was in jail. If the crime actually occurred at 1:10 a.m., why didn't Brkovic report the matter to the police who had arrived at the scene? It is true that Doolin was arrested in the parking lot of Flirts, where he dropped a gun under a car, but the evidence showed there were other persons carrying weapons that night at Flirts. The many inconsistencies in this case are obvious, and therefore the second prong of *Strickland* has plainly been met.[16]

---

[16]In light of my resolution of the due process issue, I do not consider the question of whether counsel was ineffective for failure to request an eyewitness instruction. The case for science-based, *Henderson*-type instructions is well established. *See* Fiona Leverick, *Jury Instructions on Eyewitness Identification Evidence: A Re-Evaluation*, 49 Creighton L. Rev. 555, 561–65 (2016). Conversely, there is authority for the position that generalized, nonscience-based eyewitness instructions are not effective with juries. *See Guilbert*, 49 A.3d at 725. There is also caselaw that finds both a breach of duty and prejudice where counsel fails to request a science-based jury instruction. *See State v. Maestas*, 984 P.2d 376, 381 (Utah 1999).

In addition, some cases see a relationship between the need for a science-based instruction and whether the defendant called an expert witness to explain the consensus science behind eyewitness identification. In *United States v. Wiley*, 545 F. App'x 598, 599 (9th Cir. 2013) (en banc), the Ninth Circuit noted that expert testimony is not necessary when the court gives a science-based eyewitness instruction. Conversely, in *State v. Clopten*, 362 P.3d 1216, 1228 (Utah 2015), the Utah Supreme Court noted that if an expert does testify regarding eyewitness science, the giving of a science-based instruction is discretionary. In this case, the problem is double barreled: counsel did not present expert eyewitness testimony and did not seek a science-based instruction. *See State v. Clay*, 824 N.W.2d 488, 500 (Iowa 2012) (discussing the concept of cumulative error). Under the majority's disposition, the question of whether the failure to call either an expert witness or seek a science-based instruction amounted to ineffective assistance of counsel is left unresolved and preserved for postconviction relief.

## X. Conclusion.

William Blackstone wrote that "the law holds that it is better that ten guilty persons escape than that one innocent suffer." 4 William Blackstone, *Commentaries on the Laws of England* 352 (1st ed. 1723–1780), available at http://avalon.law.yale.edu/18th_century/blackstone_bk4ch27.asp. The majority insults Blackstone, taking the position that if highly suggestive in-court identifications are not admitted, the guilty will go free. But, as noted by the Supreme Judicial Court of Massachusetts, "[t]he inverse of this is probably more accurate: the admission of unnecessarily suggestive identification procedures under the reliability test would likely result in the innocent being jailed while the guilty remain free." *Johnson*, 650 N.E.2d at 1263.

For all of the above reasons, I would reverse the conviction and remand the case.